**Sheila Ryan DeLUCA, Petitioner,**

v.

**Elaine A. LORD, Superintendent of Bedford Hills Correctional Facility and Robert Abrams, Attorney General of the State of New York, Respondents.**

**No. 90 Civ. 4026 (RJW).**

United States District Court,
S.D. New York.

Aug. 4, 1994.

---

Rogers & Wells, New York City (Mark F. Pomerantz, Warren L. Feldman, of counsel), Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT (David T. Grudberg, of counsel), for petitioner.

Bronx County Dist. Attys. Office, Bronx County, Bronx, NY, Robert T. Johnson, Dist. Atty. (Peter D. Coddington, Jonathan Svetkey, of counsel), for respondents.

### ROBERT J. WARD, District Judge.

In this petition for a writ of habeas corpus, filed on June 13, 1990, petitioner Sheila Ryan DeLuca ("DeLuca") asserts that she was (1) denied effective assistance of counsel and (2) deprived of her Sixth and Fourteenth Amendment rights to present a defense by the trial court's exclusion of expert testimony. This Court initially referred the matter to Magistrate Judge Kathleen A. Roberts, who conducted an evidentiary hearing and filed a Report and Recommendation dated December 21, 1993 (the "Report"). Magistrate Judge Roberts' comprehensive and detailed Report recommends that petitioner's application for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1), petitioner filed timely objections to the Report. After conducting a de novo review, this Court grants the writ on the grounds that petitioner was denied the effective assistance of trial counsel.

### BACKGROUND

#### I. The Uncontested Facts

On the evening of September 21, 1982, Sheila Ryan DeLuca, a recently retired New York City police officer, met friends and family at Pauline's Bar and Grill in the Bronx to celebrate her forty-second birthday and her retirement from the police force, as well as the Kingsbridge Women's Softball championship which her team had won that afternoon.[1] Because DeLuca's husband, Peter DeLuca, was not feeling well, she drove him home early. However, Mr. DeLuca insisted that his wife return to the party since she was the "guest of honor."

While DeLuca spent the night celebrating at Pauline's, Robert Bissett ("Bissett") began the evening watching a televised New York Yankee game and drinking a few beers with his friends Eugene Murphy ("Murphy") and Robert Barrett ("Barrett"). After the game, the three friends climbed into Bissett's black Ford van and drove to a bar called "Scotty's," where they drank more beer and played pool. After Scotty's closed, the three friends drove to an "after-hours club" located on East 231st Street, near Albany Crescent, arriving between 4:30 and 5:00 on the morning of September 22, 1982.

Shortly thereafter, DeLuca entered the same after-hours club with her friend, Karyn Travelina, a schoolteacher, who had been celebrating with her at Pauline's. Although the three men did not know DeLuca or Travelina, Bissett approached the two and struck up a conversation.

By 6:30 or 7:00 a.m., DeLuca and her friend, along with the three young men left the club. At some point, DeLuca got into her light blue Cadillac with the three men and spent the early morning hours driving around the Bronx. Bissett sat in the passenger seat while Murphy and Barrett rode in the back. Continuing to drink beer and wine, the four drove around for a number of hours, eventually winding up at the Bronx Park Motel where they rented a room.

At first, only Murphy and Barrett entered the motel, where they drank more beer and watched a pornographic film. Eventually, Bissett and DeLuca entered. Bissett then asked his two friends to leave so that he could be alone in the room with DeLuca.

---

1. The petitioner formally retired from the New York City Police Department six weeks before, on August 6, 1982, after fifteen years of service.

Locked outside, his friends quickly became angry and began banging on the door. In fact, Murphy became so enraged that he kicked in a window located three feet above the ground. Hearing the disturbance, the motel manager told his clerk to call the room and order the group to leave.

After that telephone call, Murphy and Barrett left the hotel on foot. Meanwhile, DeLuca and Bissett drove in her car back to Bissett's van, which was parked near the after-hours club. The two entered his van, drove for some time, and finally parked in a deserted area alongside the service road adjacent to the Major Deegan Expressway near Fordham and Landing Roads. At approximately 2:00 in the afternoon, DeLuca left the van and headed towards Fordham Road, where she called her husband.

After being out all night, DeLuca arrived home in her own car sometime around 2:30 on the afternoon of September 22nd. Her husband, who had gone out looking for his wife, drove up almost immediately afterwards. Shortly before 7:00 that evening, Mr. DeLuca, himself a retired New York City Police Captain, telephoned the 46th Precinct Detective Unit and told the police that they would find a body in a van located behind the Dale Oldsmobile Auto Dealership. The police investigated the scene and found Bissett's dead body. He had been shot in the head four times.

DeLuca's husband again called the police sometime around 8:00 p.m. and stated that the man in the van had raped his wife at approximately 1:00 that afternoon. Mr. DeLuca told the desk sergeant that he wanted to speak to the "Rape Squad". Shortly thereafter, Sergeant Rudolph Eberhardt ("Eberhardt") of the Bronx Sex Crimes Squad called the DeLucas. After answering the telephone, Mr. DeLuca immediately handed the receiver to his wife who described her abduction and rape to the sergeant.

According to Eberhardt, DeLuca told him that, as she left the after-hours club, she was forced into a van by three men and taken to a motel near the Bronx Zoo. She stated that one of the men had subsequently forced her back into the van and taken her to the vicinity of Fordham Road and the Major Deegan Expressway where he had raped her. DeLuca also told Eberhardt that she finally managed to escape by hitting the man on the head with a bottle, which caused him to roll off of her. DeLuca stated that when she left the van, Bissett was lying in the back, bleeding. She then walked to a gas station, where she called her husband to come get her. When he failed to appear, DeLuca walked back to her car, and drove home. DeLuca then told Eberhardt that she did not wish to say anything more without her lawyer present.

The first police officers arrived at petitioner's home sometime around 8:45 p.m. While Peter DeLuca introduced himself and his wife as former officers and stated that "the bum in the truck down there raped my wife this afternoon," petitioner remained quiet. A few minutes later John Patten ("Patten"), the DeLucas' newly retained attorney, telephoned and told the officers that he did not want his clients speaking to the police prior to his arrival.[2] No further efforts were made to interview the DeLucas after Patten's call.

Arriving at the DeLucas' home, Patten announced that he would not allow any questioning of petitioner or her husband, but asked that the rape investigation proceed. John GaNun ("GaNun"), Patten's law partner, arrived soon after and the DeLucas spent some time consulting privately with their attorneys. Following Patten's advice, DeLuca then gave the police the jeans, sneakers, sweater, and torn underpants she

**2.** John Patten had never tried a murder case before being retained by DeLuca. He began his career in 1969 at the Manhattan District Attorney's Office, where he worked in the Rackets Bureau, Complaint Bureau, and Criminal Court Bureau. He prosecuted perjury, extortion, robbery, and assault cases, but never a homicide. During his time at the District Attorney's Office, he tried a total of thirty jury trials.

In 1974, he left to enter private practice with Carmine Peratta, and finally, began his partnership with John GaNun in 1978, handling primarily criminal cases. At the time he tried the DeLuca case, he had tried approximately twenty-seven cases as a defense attorney.

had been wearing the previous evening. Eberhardt noticed that the pant legs of the jeans were still damp up to a point approximately nine inches above their bottoms and that the sneakers were also damp.

The DeLucas and their counsel accompanied the police back to the 52nd Precinct where petitioner filled out a formal rape complaint, in which she claimed that three men had abducted her using a knife. After filling out her complaint, DeLuca was taken to North Central Bronx Hospital for a medical examination and returned home with a Detective Fusilli sometime after midnight.

Pursuant to an earlier agreement entered into with Patten's consent, DeLuca went to her bedroom to retrieve her guns and turn them over to the police. Peter DeLuca, who was waiting in the living room with Fusilli, reached over a nearby hutch and picked up a holstered, off-duty revolver which he gave to Fusilli. Mr. DeLuca told the detective, "This is the gun you're looking for." Detective Fusilli unloaded the .38 calibre revolver and found that it contained five spent shells. Petitioner then came out of the bedroom and produced two additional regular service revolvers which were loaded with eleven live bullets.

Ballistics tests positively established that petitioner's off-duty revolver, which contained the five spent shells, had been recently fired and was the same gun that was used to kill Bissett. Investigators searching petitioner's blue Cadillac discovered two beer bottles and a beer can. A latent fingerprint lifted from a Heineken bottle was identified as belonging to Robert Barrett. On Friday, September 24, 1982, DeLuca was arrested for the murder of Robert Bissett.

## II. *Defense Counsel's Pre–Trial Investigation*

DeLuca first told Patten her version of the events of September 21 and 22, 1982 on the night that he was retained as her counsel.[3] After asking the police to cease their questioning of DeLuca and her husband, Patten and GaNun had a private conversation with the couple. During that meeting, DeLuca explained the facts and circumstances surrounding the shooting of Bissett, an account she repeatedly discussed with her counsel prior to trial.[4]

### A. *The Petitioner's Version of Events*

DeLuca testified before Magistrate Judge Roberts that at approximately 4 a.m., she and Travelina arrived at the after-hours club in her car. After entering the bar, they were approached by Bissett and his friends, who offered to buy them drinks. DeLuca and Travelina were polite but answered that they already had drinks. Bissett, Murphy, and Barrett responded by calling the two women "dykes" and "lesbians." DeLuca overheard their remarks and answered "You don't know who we are. You don't know what we're about. And I just wish you'd leave us alone and stop calling [us] names."

DeLuca then moved to the black-jack table while Travelina remained at the bar. According to petitioner's testimony, she played cards for approximately two hours. Eventually, Travelina told DeLuca that she needed to call a colleague, whom she was supposed to drive to school in the morning. Since

---

**3.** Since this petition is at least partially premised on defense counsel's failure to evaluate both the strength of the prosecution's case as well as the possible defenses available to DeLuca, and because the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) requires an examination of the totality of the circumstances, this Court must review all the information available to Patten prior to trial.

**4.** At the evidentiary hearing held before Magistrate Judge Roberts on July 21, 22, 23, and 29, 1992, both Patten and GaNun testified that petitioner did indeed tell them her version of the events. They further testified that the account of

rape and abduction given by DeLuca before the magistrate judge was consistent with their unrefreshed recollection of what they were told in 1982.

In addition, Ellen Yaroshefsky, Toni Iovieno, and Flora Colao, all witnesses who testified at petitioner's evidentiary hearing, confirmed that DeLuca's current statements are consistent with the account they were each told at various times prior to her 1982 trial. This version of events was also recorded in the notes of Dr. Daniel Schwartz, a forensic psychiatrist with whom Patten consulted shortly after being retained by DeLuca.

Travelina did not want her friend to know why she was missing school that day, she decided not to make the telephone call from the noisy bar. DeLuca and Travelina walked out of the club and petitioner offered to drive Travelina to the nearest telephone but Travelina told her that she could use the walk. The two parted company and DeLuca re-entered the club and resumed playing cards.

When DeLuca left the bar about a half hour later, she was accosted by Barrett, Murphy, and Bissett. Bissett allegedly told her, "We're going to have some fun. Get in the car and don't say anything. My friends and I are going to have a party. Just do as we say and you won't get hurt." They forced her into the driver's seat of her Cadillac. Then, pushing her seat-back forward, Barrett and Murphy climbed into the back of her car. Bissett ran around the front of the car and got in the passenger seat beside DeLuca. Once they were all in the car, either Bissett or Murphy threatened DeLuca with a knife. There was an argument among the men as to who should drive. Since she was the most sober, DeLuca offered to drive and they all agreed with her suggestion.

The three men then ordered her to drive through the Bronx, telling her "to turn at various places." During the ride, Barrett, Bissett, and Murphy began talking about various sexual exploits that they had engaged in with other women, which they referred to as "gangbangs." The men discussed going up to the country to do what they had done to another woman, including tying her to a bed "and that type of thing." DeLuca recalled Bissett asking her, "Wouldn't you like that?" From that moment on, DeLuca stated that she did not speak to them at all. Angered that she would not reply to his question, Bissett told his friends, "[t]his one is not cooperative like the others," and told her, "I'll have you know, killing is nothing to me, I've done it before." The other men just laughed. DeLuca recalled that the men smoked marijuana and snorted a white powder and it appeared to DeLuca that Bissett was in charge.

DeLuca testified that she thought she was going to be raped and killed. Escape did not seem possible. She thought about crashing her car, but could not bring herself to do it and she saw no police cars—to whom she could wave for help—while she was driving. Although she recalled stopping to buy more beer, she did not remember stopping at a paint store, nor stopping at the Bissett home. DeLuca was not aware of how long she drove; she knew only that it "seemed like forever" and that she was "completely terrorized."

DeLuca continued driving until they reached the Bronx Park Motel. While the other two men went into the room he had rented, Bissett told DeLuca, "this is what it is going to be. [The] four of us are going to go and we're going to have sex." DeLuca begged him to let her go. He said, "behave yourself, and it will be over soon . . . I don't want to hear you talking above a whisper, just walk into the room and do as I say when you get in there. If you don't do as we ask, we're just going to kill you."

Hoping to isolate Bissett from the others so that she could plead her case, DeLuca told him that she was "not used to this. I'm not a hooker." She urged Bissett to get rid of Barrett and Murphy because she would be more willing to have sex with him alone. In apparent agreement, Bissett sent the other two men out of the room, telling them that he would let them in when it was their turn. Barrett and Murphy left reluctantly, telling Bissett that they did not want to stand outside for long, and that he better not keep DeLuca all to himself.

After Barrett and Murphy left, Bissett tried to take DeLuca's top off. When she pulled away, he "smashed her" in the shoulder or neck and reminded DeLuca that he had already warned her. Barrett and Murphy started pounding on the door yelling for Bissett to let them in. Murphy then kicked in the window. Shortly thereafter, the telephone rang and Bissett picked it up. After he hung up, he was "furious at everybody." Cursing uncontrollably, Bissett yelled, "bitch, all you had to do was cooperate. You said you would if I let those other two guys out, and you went back on your promise." To Barrett and Murphy he screamed, "you fucks, you screwed it up." Visibly and ver-

bally angry, he told DeLuca to get in the car, threatening, "if you dare cause me any more trouble you're dead." Barrett and Murphy left the motel on foot, while DeLuca and Bissett drove off in her car with DeLuca at the wheel.

Although DeLuca is not sure how long she drove with Bissett, she testified that they ended up back at Bissett's van, where he repeated his warning that she better not try anything and ordered her to get into the back of the van. She does not remember seeing a weapon, but she did testify that as she climbed in, he gave her "a good shove." Immediately, DeLuca glanced around the inside of the van and saw that there were no doors other than the two in front and the two in the very back. She also noticed that there was no door handle on the front passenger door and that the dashboard, floor, and walls were all carpeted.

Bissett climbed into the driver's seat and drove to the location near Fordham and Landing Roads. There, Bissett punched De-Luca several times, took off her clothes, and then forced her to perform oral sex on him. He then threw her down and attempted to anally rape her, but was unsuccessful. Finally, he forced her to have vaginal intercourse. "He was on top of me for a long time," she testified, "and then he just became still and didn't move." At this point, DeLuca grabbed a bottle that was in the back of the van and struck Bissett on the head, causing him to roll off of her. DeLuca quickly put on as many clothes as she could and climbed out of the front driver's side door. Petitioner testified that she did not have her gun with her and did not believe she hit Bissett hard enough to kill him.

DeLuca ran away from the van to a gas station on Broadway. There, she called her husband and asked him to pick her up. Realizing after she hung up that she had inadvertently given him the wrong address, and afraid that Bissett might chase her, petitioner decided to walk back to her car.

DeLuca immediately headed for home but stopped when she passed Travelina driving by in her car. By this time, Travelina had learned that DeLuca had not returned home the night before and was out looking for her. They waved to each other, pulled over, and Travelina climbed into DeLuca's car. DeLuca then told Travelina that she had been raped, but pleaded with Travelina not to discuss what happened with anyone. She just felt lucky to be alive and wanted to go find her husband. When Travelina asked her why she did not kill her rapist, DeLuca told her she did not have her gun. Leaving Travelina, petitioner continued her drive home.

As she turned into her driveway, Mr. De-Luca pulled in right behind her and asked her where she had been. DeLuca apologized to her husband for giving him the wrong address. Noticing that the console of her car was twisted, he asked if everything was alright. She told him there had been a problem earlier, but that everything was alright now, an answer she claims he accepted because their "relationship was based on trust."

DeLuca testified that she initially tried to forget what happened to her. She did not want to talk about the rape and just kept thinking how lucky she was that the ordeal was over and she was still alive and walking. After getting out of her clothes and showering, DeLuca tried to take a nap. However, even though she had been awake for over twenty-four hours, she was too disturbed to fall asleep.

She decided to go into the living room where she spoke with her husband. DeLuca said she tried to appear "as normal as I possibly could be" during the conversation. When Mr. DeLuca asked her where she had been, she told him about the after-hours bar, which petitioner claims he "understood readily," since he knew she liked to play cards.

It was not until Mr. DeLuca drove their housekeeper home, however, that DeLuca began to break down. She started crying and shaking violently. While she was still alone in the house, she took another shower to calm down and relax. However, this attempt at therapy did not work and she continued to weep uncontrollably. When her husband returned, he was shocked to see his normally stoic wife "go[ing] to pieces." Mr. DeLuca immediately tried to comfort his wife and questioned her about what happened.

Petitioner testified that she tried to hold back, but eventually broke down and told him about the abduction and rape. She felt nauseated and was in pain. Fearing venereal disease, she told her husband that she needed to go to the hospital. Before leaving, she went to her bedroom and got her gun because she "felt so vulnerable" and wanted protection.

Mr. DeLuca wanted to report the rape, but she told him she did not want to talk to anybody. DeLuca testified that she felt embarrassed about reporting the rape to the police, because, as a former police officer from the Bronx, she was afraid someone she knew might find out. Mr. DeLuca persisted, however, and even offered to report the incident himself if his wife could tell him where it took place. DeLuca told her husband that she did not know the names of the streets where it happened, but agreed to show him where she was raped so that he could report it.

On the way to the hospital, DeLuca directed her husband to the site of the rape. As they neared the scene, DeLuca was shocked when her husband pointed out that Bissett's van was still there. DeLuca testified that she wanted to leave, but her husband parked the car, got out, and walked towards the van, heading around a puddle toward the driver's side door. Afraid to be left alone, DeLuca followed, instinctively reverting to police procedures—drawing her pistol and going to the other side of the van. As her husband opened the front driver's side door, DeLuca opened the front passenger door and they peered into the van together, although, at first, they saw no one. Mr. DeLuca told his wife that the van was probably stolen, but there might be fingerprints that they could use to track down her assailant.

Suddenly, her husband, who was standing on the driver's side running board, yelled, "There he is. Get out of there, you son of a bitch!" DeLuca testified that she then saw Bissett lunge from the back of the van, up and between the two front seats. He shoved Mr. DeLuca away with his left arm, knocking him off the running board and out of DeLuca's field of vision. DeLuca, who was standing in a position to protect her gun, called

out "Don't move." Bissett ignored DeLuca's warning and pounced at her, yelling, "Bitch, this time you're dead. I'm going to kill you." He grabbed her left arm and started pulling her into the van. Because she was caught off balance, DeLuca testified that she feared Bissett would get her gun and kill both her husband and herself. Although she cannot recall how many shots she fired, she remembered that she shot more than once and fired as rapidly as she could at his upper body and head.

Hearing the gunfire, Mr. DeLuca ran around the van, calling out to his wife, "My God, I thought you were shot." DeLuca testified that she does not know how her husband navigated the puddle because she could not see him when he was behind the van. Seeing his wife "visibly upset" and shaking uncontrollably, Mr. DeLuca took the gun from her hand, climbed up to peer into the van, shut the passenger door, and walked her back to their car. The DeLucas immediately drove home where her husband called the police.

### B. *Other Evidence Available To the Defense*

In preparation for trial, Patten gathered additional evidence in order to strengthen DeLuca's credibility and provide corroboration for her version of the events of September 21–22, 1982.

#### 1. *Peter DeLuca and Karyn Travelina's Testimony*

Patten was aware that both Peter DeLuca and Karyn Travelina were eyewitnesses to the events petitioner described to him and both were available to verify her testimony. Mr. DeLuca, like his wife, met with Patten and GaNun immediately after the shooting and told them of his involvement in the sequence of events leading up to Bissett's death. Karyn Travelina would have been able to testify about the encounter with the three men in the after-hours club and her discussion with DeLuca when she ran into her on her way home.

Throughout the pretrial period, Mr. DeLuca expressed his desire to testify in his wife's

defense. In furtherance of that desire, Mr. DeLuca provided counsel with notes summarizing his recollection of the events. A review of those notes indicates that, at trial, Mr. DeLuca could have testified about: (1) his wife's telephone calls in the early afternoon of September 22, 1982; (2) her complaint of rape later that afternoon and her fragile emotional and physical state at the time; (3) their trip to the area where the van was parked as well as their unexpected encounter with Bissett; and (4) the early evening time of the shooting, which was contrary to the prosecution's theory.

Shortly after her arrest, he was diagnosed as having cancer, and the trial date was adjourned several times because his medical condition made his ability to testify questionable. Ultimately, Mr. DeLuca had the nerve endings in his back severed, so that he would be able to testify without suffering too much pain.

### 2. Medical and Physical Evidence

Patten was also aware that Dr. Guidetti, the physician at North Central Bronx Hospital who examined DeLuca the night she reported the rape to the police, as well as her attending nurse, were available to testify that DeLuca was in severe pain and suffered vaginal redness and bleeding.

In addition, photographs, taken on September 24, 1982, which showed bruising on DeLuca's body were available to defense counsel. On the day the photographs were taken, DeLuca was examined by Dr. William Clyne, her family physician. Dr. Clyne signed an affidavit stating that he specifically remembered several large bruises and several smaller bruises on various areas of DeLuca's body, particularly her breasts and thighs and that he did not believe these injuries to be self-inflicted.

### 3. Character Evidence

Many acquaintances of petitioner made it known to Patten that they were willing to testify to DeLuca's good character and reputation in the community for truth and honesty. Among these prospective witnesses were police officials, former teachers, and members of the Franciscan religious order where DeLuca had trained.

### 4. Prior Similar Conduct by Bissett

To support DeLuca's claims that Bissett, Barrett, and Murphy had threatened her with tales of past "sexual exploits they had had with other women—gang bangs," both Patten and DeLuca investigated Bissett's past.[5] That investigation led them to a woman named Elizabeth Kochovos ("Kochovos") who told them she would be willing to testify at petitioner's trial.

After reading of Bissett's death, Kochovos called her local precinct to report that, two years earlier, Bissett had abducted and attempted to assault her. Kochovos explained that she did not pursue her claim against Bissett, because his mother, Helen Bissett, called Kochovos's mother and pleaded with her not to press charges.[6] The defense learned of this report, and later obtained a statement from Kochovos. In her statement, Ms. Kochovos described how Bissett became enraged and would not let her leave his car. According to Kochovos, Bissett beat her, tore her shirt and underwear, and threatened to take her "to visit some friends."

### 5. Rape Trauma Syndrome Evidence

Concerned with his client's apparent lack of an immediate outcry, Patten also sought out evidence on Rape Trauma Syndrome, the symptoms exhibited by victims following a rape. During this search, he was put in contact with Flora Colao, an expert in the field and founder of the St. Vincent's Hospital Rape Crisis Center. In preparation for trial, DeLuca met with Colao on several occa-

---

**5.** According to DeLuca, Bissett and his companions described having taken another woman "up to the country," where she was tied to a bed and raped. Bissett also threatened to kill DeLuca if she was not cooperative, saying that "killing is nothing to me, I've done it before."

**6.** When cross-examining Helen Bissett at trial, Patten established that she had, in fact, contacted Kochovos' mother. However, he never developed this line of questioning beyond Mrs. Bissett's initial contact.

sions. Colao was expected to testify at trial that rape victims often do not "cry out" to the first person they see following a rape, and initially try to resume their normal activities with no mention of the assault.

### 6. Evidence Concerning DeLuca's Sexual Orientation

Finally, petitioner stated at the hearing before Magistrate Judge Roberts that she was a homosexual and did not have a traditional sexual relationship with her husband. Although Patten does not recall being told this by DeLuca, he does remember having explicit discussions with her about her sexuality. Patten testified that he was aware that DeLuca was not interested in "traditional" heterosexual relations with men and that her only intimate heterosexual contact had occurred when she was abused by an older man when she was eight or nine years old. He also believed that his client's marriage to Peter DeLuca was more akin to a father/daughter relationship, and characterized it in those terms when speaking to Dr. Daniel Schwartz concerning petitioner.[7]

### III. The Evidence Presented At Trial

#### A. The Prosecution's Case

The State's case at trial was built entirely on circumstantial evidence. Largely through the testimony of Murphy and Barrett, as well as the testimony of the after-hours club's blackjack dealer, Bissett's mother, the Bronx Park Motel's clerk and manager, a paint store owner, and the police officers and city officials investigating this case, the prosecution attempted to portray DeLuca as a loose woman, who had gone on a "partying spree," had "hit on" Bissett, and after satisfying her sexual desires, had murdered him in cold blood. As the prosecutor put it in his closing argument:

> Strange combination, isn't it? Bissett and Sheila Ryan DeLuca—42 year old married woman, 28 year old single man. A probationary fireman who had three months to go until he became full fledged as a fireman in the New York City Fire Depart-

ment as opposed to the fifteen year veteran cop who had left her husband when he went home after the bar and she went out for more fun and more partying. She got what she wanted. What did Bissett want with a 42 year old heavyset blonde woman when he's got his girlfriend? What does she want with a 28 year old good-looking fireman? I leave that to you to consider.

Both Barrett, a 22 year-old part-time housepainter, and Murphy, a New York City Emergency Medical Services Paramedic, testified that they spent the night of September 22 with their friend Robert Bissett. They both stated that DeLuca and Travelina entered the after-hours club shortly after they had arrived there in the early morning hours of September 22. Although neither Barrett nor Murphy knew DeLuca or Travelina, Bissett struck up a conversation with them and spoke with DeLuca at the club's blackjack table, while Barrett and Murphy continued to talk at the bar.

According to the testimony of Barrett, Murphy, and Michael Belloise ("Belloise"), the club's blackjack dealer, the group left the after-hours club together at approximately 6:30 a.m. As petitioner was walking out, Belloise noticed that Travelina seemed upset and heard DeLuca tell one of the three men, "that he shouldn't have called her girlfriend a dyke." The young men laughed it off and then exited.

When they emerged from the after-hours club, Barrett and Murphy testified, they walked directly across the street to Bissett's van, while he remained behind to speak to the women. After a few minutes, Bissett crossed to the van and let his friends in, telling them to wait there until he returned. Bissett then climbed into the back of DeLuca's blue Cadillac and drove away with the two women.

Although neither Barrett nor Murphy made any mention of DeLuca re-entering the club once the group had left, according to Belloise and Robert Safian, the club owner, DeLuca returned within five or ten minutes

---

7. Patten consulted Dr. Schwartz, a forensic psychiatrist, in preparation for trial. The notes taken by Dr. Schwartz during that meeting reveal that DeLuca had described herself to Patten as "asexual" and considered heterosexual relations "dirty."

of leaving the bar to use the ladies room. When she came out of the bathroom, she stopped at Belloise's blackjack table where Arthur Fuhst and a customer named Diane were still playing. After either Fuhst or Diane said something to petitioner, Belloise testified that he heard her say, "I'm an ex-cop and these guys better not fuck with me because I'll kill them." [8] Petitioner then went back outside.

According to Barrett and Murphy's testimony, DeLuca and Bissett returned approximately twenty minutes to a half-hour later without Travelina. DeLuca pulled her Cadillac alongside the van and Bissett, who was now in the front passenger seat, told Barrett and Murphy to get into the car. For about fifteen minutes, the four just sat there parked by the van, passing around some "sparkling wine" which DeLuca and Bissett had been drinking.

Leaving the van parked by the after-hours club, DeLuca and the three men began driving around. Barrett and Murphy claimed that petitioner and Bissett "seemed to sort of hit it off," and they were "sort of left out of the conversation." As they were being driven around, both Barrett and Murphy dozed off. At one point, Barrett awoke and Bissett gave him money to buy beer in a superette on Fordham Road.

At 8:30 a.m., Helen Bissett testified, she was awakened when she heard her son and a woman enter the house. Mrs. Bissett testified that she could not see them, but heard them speaking softly in the entrance foyer. When Bissett came into his mother's bedroom, she asked him who the unseen visitor was. Her son told her that the woman had

to go to the bathroom and that he was then going to take her home. Before leaving, Bissett asked his mother for some money to buy paint, and she gave her son a blank check. Bissett then kissed his mother goodbye and left the house.[9]

According to the testimony of William Lipton, the owner of the Blue Store, Bissett stopped by the store sometime between 7:00 and 9:00 on the morning of September 22. Bissett cashed the blank check his mother had given him and used some of the money to pay for an outstanding bill. During the transaction, Bissett had a brief "friendly" chat with Lipton, and, according to Lipton, did not appear to be drunk or "high." [10]

Barrett and Murphy testified that the group continued to drive around the Bronx while drinking more beer and smoking marijuana until they reached the Bronx Park Motel, located on Fordham Road and Crotona Avenue. Bissett told the motel clerk that he needed a room with a waterbed for a "short stay" and asked for an x-rated movie. When asked to pay, the hotel clerk testified, Bissett flashed his fireman's badge. At first, only Barrett and Murphy went into the hotel room. They testified that they started to watch the porn film and continued to drink beer.

After approximately fifteen or twenty minutes, Bissett came to the door and asked the other two men to leave the room. Barrett and Murphy immediately picked up their beer and left. Claiming that they became bored and angry because they wanted to go home and were left standing in the parking lot, Murphy and Barrett testified that they

8. Testifying before the grand jury only three weeks after the incident, Belloise reported the statement somewhat differently. At that time, Belloise did not mention DeLuca saying anything about killing anyone. Instead, he told the grand jury, "After she used the bathroom she came out and she said to nobody in particular—I don't know if anyone knew her—in general she just said that she was an ex-cop and the guys outside better not fuck with her because she wouldn't take any shit from them and she might get them back or something." In addition, Belloise made no reference to DeLuca's alleged statement when he was questioned by police immediately after the killing. Belloise attempted to explain the discrepancy on re-direct examination, stating

that, before the grand jury, he had used his own words but at trial, he wanted to use the actual words he remembered her saying.

9. Neither Murphy nor Barrett testified that they had stopped at Bissett's house. Under the prosecutor's theory, they had presumably "dozed off" during this rest stop. However, Patten did not pursue this question on cross-examination.

10. Again, as was the case with the stop at Bissett's home, neither Barrett nor Murphy made any mention in their testimony of a visit to the Blue Store, nor did Patten pursue this discrepancy in his questioning of them.

began to bang on the door, yelling "let's go" to Bissett. Then Murphy kicked in the window. When Bissett came to the window, looking a "little angry," the two took their beer and left on foot. Neither Barrett nor Murphy had ever seen DeLuca with a gun during the time they were with her that morning.

Both the motel clerk and manager verified that Bissett had rented the room at 10:00 a.m., and that there was a disturbance about a half hour later. The motel manager, who had observed Murphy kicking in the room's window, ordered his clerk to call the room and tell its occupants to leave, or he would call the police. The motel clerk called Bissett and told him to come to the office for a refund. In response to this call, DeLuca and Bissett left the motel room and got into her car. Although the motel clerk had taken the refund money from the drawer, Bissett never returned to claim it.

Sometime between 1:00 and 1:30 p.m., a team of workers from the New York City Department of Water Supply arrived at the service road adjacent to the Major Deegan Expressway. One of their trucks descended a "ramp" into a gully-like, relatively desolate area. Near the bottom of the ramp, about twenty-five feet away from where they parked the truck, the workers saw Bissett's van and noticed that it was moving around and bouncing up and down. On the van's door was a sign that read, "Don't laugh, your daughter might be in here" and the crew joked that, "somebody was getting laid in the van." Stanley Berman, one of the workers, testified that the front of the van was up on a two-inch curb. Both doors were closed. Berman stated that the van was surrounded by a large puddle of water.

A Department of Sanitation front-end loader was also in the area of the van between 1:30 and 2:00 that afternoon. Basil Meola, the operator of the front-end loader, testified that he saw Bissett's van parked "half in and half out" of a large puddle of water. Meola noticed that both front doors were closed, but that the back window was slightly open. Like the water supply workers, he noticed that the van was bouncing up and down.

At about 2:00 p.m., one of the water department workers, who was still sitting in his truck, looked up and briefly noticed a tired looking woman matching DeLuca's appearance (heavyset with dark blond hair) stumbling up the ramp. The woman staggered past the two other crew members who had gone to the top of the ramp to do some work. Neither the water department workers, nor Meola heard any gunshots. In addition, none of the water department employees who saw the woman leave noticed a gun in her hands.[11] At trial, the workers were unable to identify the woman as DeLuca.

Ann O'Byrne ("O'Byrne"), an exchange student from Ireland who spent the summer of 1982 in the United States, testified that she worked one day a week as a house cleaner for the DeLucas. On the morning of September 22, O'Byrne met Travelina at Pauline's where she reluctantly accepted Travelina's offer to drive her to the DeLuca home, even though Travelina appeared drunk.

When the two arrived, Mr. DeLuca told O'Byrne that his wife was not yet awake. After Travelina left, Mr. DeLuca confided in O'Byrne that his wife had not yet returned home from the night before. Sometime around 1:00 p.m., the telephone rang. When Mr. DeLuca answered it, O'Byrne heard him say, "What's wrong with you now?" O'Byrne did not listen to the rest of Mr. DeLuca's conversation, but when he hung up he told her that "he was going out looking for Sheila."

At approximately 1:30 p.m., O'Byrne received a telephone call from Mr. DeLuca "to see [whether] Sheila [had] called or come home yet." O'Byrne informed him that she

---

11. The prosecution theorized that the workers were unable to hear the gunshots as a result of the high level of noise in the area. The Department of Sanitation's front-end loader's diesel engine was quite noisy. Despite the fact that the water supply truck was closer to the van than it was to the front end loader and that the workers

were able to hear each others conversation, the prosecution argued that, combined with the nearby highway truck traffic, the fairly high level of noise in the immediate area drowned out the sound of gunfire. In addition, the prosecution pointed out that the gunshots would have been muffled by the carpeting in the van.

had not heard from her, to which Mr. DeLuca replied, "If she calls or comes home, tell her I'm on my way back." He arrived home five minutes later and told O'Byrne that he'd been "everywhere looking for Sheila, down by 207th Street by the Mobil gas station." Mr. DeLuca again drove off in search of his wife.

O'Byrne saw DeLuca pull into the driveway in her car sometime around 2:20 p.m. Almost immediately thereafter, Mr. DeLuca pulled up in his tan Ford. O'Byrne noticed that "[t]hey stayed talking in the garden for a few minutes." Then petitioner entered the house alone and immediately went to her bedroom where she undressed and put on a bathrobe.

After getting out of her clothes, DeLuca emerged from her bedroom and told O'Byrne to go downstairs and clean the basement. From the basement, O'Byrne heard the De-Lucas, who were in the living room above, speaking in high-pitched tones. After finishing her cleaning around 3:45, O'Byrne returned to the living room, where she sat between the DeLucas on the couch and drank coffee. O'Byrne noticed that Mr. De-Luca "wasn't his usual self at all" and that he "didn't say much." She also noticed that he was still wearing the same clothing that he had worn earlier in the afternoon, and that there were no water or mud stains on his pant legs.

They all spoke briefly about gambling in Atlantic City, where O'Byrne was planning to go with her aunt that Friday. After suggesting that his wife take a look at an article he had been reading about "an after hours gambling place," Mr. DeLuca drove O'Byrne home sometime around 4:30 p.m.

The police officers who investigated the case testified to receiving a series of calls from Mr. DeLuca between 7:00 and 8:00 p.m., in which Mr. DeLuca reported the body left in the van and Mrs. DeLuca's rape. Sgt. Eberhardt recounted the account of rape that petitioner had conveyed to him that night.

The officers who first arrived at the crime scene testified that they found Bissett's van still parked in a pool of water, where it had been observed earlier in the day by the Water Supply crew. The driver's side door was open and the windows of both doors were down. Looking inside the van, the police found Bissett's fully clothed body, slumped face down between the two front seats, appearing as if he had been coming from the rear of the van when he was killed. According to the police report, blood was found "splattered in the front area of the van." Two partially deformed bullets were recovered from the interior of the van, one in the rear section and the other under Bissett's head. Ballistics tests, entered into evidence, established that the bullets had come from DeLuca's off-duty revolver. Three bottles of Riunite wine were also recovered from the back of the van.

Dr. Beverly Leffers, Deputy Chief Medical Examiner, testified that the autopsy she performed on Bissett revealed four close "in and out" bullet wounds, caused by four separate bullets. Each entry wound was on the right side of the head. One bullet had entered "towards the front of the head between the eye and the ear" and "traveled leftwards and backwards and exited from the back of the head." The other three bullets entered above and behind Bissett's right ear, traveled straight across his head, and exited near his left ear. She also testified that gunpowder was found in Bissett's wounds, indicating that the shots were fired from a distance of twelve to eighteen inches. Evidence of cocaine use was also discovered in Bissett's body.

Finally, Dr. Leffers confirmed that a "very small bruise was found on the back of Bissett's head, consistent with his being struck with a bottle." Unfortunately, the precise time of his death could not be determined because Bissett's body had been refrigerated to prevent decomposition and this altered the progression of signs that appear after death.

Dr. Robert Shaler, the Director of Serology for the Medical Examiner's Office, testified that serology tests he performed revealed that Bissett had engaged in both vaginal and oral sex some time before his death. Tests on DeLuca's torn underpants showed that they contained seminal fluid from a man with type O blood, Bissett's blood type.

B. *The Defense Case*

At the close of the State's case, defense counsel unsuccessfully sought to call Flora Colao, petitioner's expert witness on rape trauma syndrome. Patten wanted Colao to testify in order to rebut the prosecution's theory that DeLuca fabricated her rape claim in order to hide her guilt. However, Justice Lawrence Tonetti, the trial judge, denied the request.

Confident that the prosecution was wrong about the time the shooting occurred,[12] and that the State had not completely refuted the possibility that Peter DeLuca had killed Bissett,[13] the defense rested, presenting no evidence to the jury.

On April 18, 1984, the jury found petitioner guilty of Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25(1). DeLuca is currently incarcerated at Bedford Hills Correctional Facility, serving a sentence of twenty years to life. Peter DeLuca died shortly after his wife was sentenced.

IV. *Post–Conviction Proceedings*

On May 15, 1984, petitioner moved to set aside her verdict pursuant to N.Y.Crim. Proc.L. § 330.30. The motion was denied on May 18, 1984, and petitioner was sentenced as set forth above. Petitioner's conviction was affirmed by the Appellate Division without opinion on April 11, 1985. *People v. DeLuca*, 110 A.D.2d 1091, 488 N.Y.S.2d 529 (1st Dep't 1985). Subsequently, DeLuca's application for leave to appeal to the Court of Appeals was denied. *People v. DeLuca*, 65 N.Y.2d 978, 494 N.Y.S.2d 1047, 484 N.E.2d 677 (1985) and certiorari was denied on February 24, 1986. *DeLuca v. New York*, 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 305 (1986).

On May 3, 1989, DeLuca moved to vacate her conviction pursuant to N.Y.Crim.Proc.L. § 440.10, raising, for the first time, a claim of ineffective assistance of trial counsel, and publicly admitting, for the first time, that it was she who shot and killed Bissett. The § 440 motion was denied on August 24, 1989. On December 12, 1989, the Appellate Division, First Department, denied petitioner's application for leave to appeal the denial of her § 440 motion.

On June 13, 1990, DeLuca filed this petition for a writ of habeas corpus. Petitioner claimed, as she did in her § 440 motion, that she had been denied effective assistance of counsel by various errors of her trial attorney which deprived her of the right to make critical decisions in her case, including the decision whether to testify and present her account of rape to the jury. DeLuca also argued that the trial court's refusal to allow the rape trauma syndrome expert to testify had deprived her of her right to present a defense.

This Court referred the matter to Magistrate Judge Roberts on January 24, 1991 and an evidentiary hearing was held on July 21, 22, 23 and 29, 1992. As noted above, on December 21, 1993, Magistrate Judge Roberts issued her Report recommending that the petition be denied. The Report found that the performance of petitioner's counsel had not been constitutionally deficient, and that the refusal to allow rape trauma syndrome evidence had not deprived petitioner of any constitutional rights.

Petitioner has filed objections with the Court, in which she argues that the magistrate judge's factual findings overlooked critical portions of the record and that her legal recommendations are not supported by the

---

**12.** While it is obvious from their testimony that both Patten and GaNun found the fact that the prosecution was "wrong" about the time of the shooting significant, this Court is at a loss to understand why they believed it would be equally significant to the jury. The attorneys knew from their conversations with their clients that the shooting actually took place in the evening. However, since the jurors were not privy to this information and no evidence was presented by the defense establishing the "real" time of the shooting, the jury had no reason to question the time hypothesized by the prosecution, let alone find that their "mistake" was significant.

**13.** No evidence was presented at trial implicating Mr. DeLuca in the shooting of Bissett. Patten's confidence rested solely on the fact that, as her husband, Mr. DeLuca had access to petitioner's gun and likewise had a motive to kill his wife's rapist. However, the State had shown that nobody fitting Mr. DeLuca's description was seen near the van at the time that they theorized the shooting took place.

facts in this case or the law. She urges that the petition be granted and that this Court order a new trial.

## DISCUSSION

### I. Standards for Reviewing a Magistrate Judge's Report and Recommendation

■ When timely objection has been made to a portion or portions of a magistrate judge's report, the district judge must "make a de novo determination . . . of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P. *See also,* 28 U.S.C. § 636(b)(1). In addition, 28 U.S.C. § 636(b)(1) affords the district court broad latitude in considering a magistrate judge's recommendation, even if no party objects to it. *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989). The judge may then accept, reject, or modify, in whole or in part, the magistrate judge's proposed findings and recommendations.

■ However, the district court's obligation to make a *de novo* determination of properly contested portions of a magistrate judge's report does not require the judge to conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). It is sufficient that the district court "arrive at its own, independent conclusion about those portions of the [magistrate judge's] report to which objection is made." *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983).

### II. Ineffective Assistance of Counsel

■ In *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), the Supreme Court established a two pronged test for analyzing ineffective assistance of counsel claims. First, petitioner must show that her counsel's conduct was objectively unreasonable. Second, she must demonstrate that her counsel's deficient performance prejudiced her defense. In other words, she must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 694, 104 S.Ct. at 2068. This is no light burden. In order to prevail on her claim, DeLuca must overcome the "strong presumption that [her] counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

Lest reviewing courts inflexibly apply this standard, the Supreme Court emphasized that the goal of the effective assistance guarantee of the Sixth Amendment is to ensure fundamental fairness.

> Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.* at 696, 104 S.Ct. at 2069.

Recognizing that "[t]here are countless ways to provide effective assistance in any given case," the Supreme Court did not attempt to specifically define the types of professional conduct that constitute "adequate assistance." *Id.* at 689, 104 S.Ct. at 2065. Rather, *Strickland* instructs examining courts to judge each claim individually by looking to the legal profession's "prevailing norms of practice" in order to determine whether, under the particular circumstances present, the attorney's actions constitute reasonable assistance.

This does not mean that *Strickland* gives no explicit guidance. Some duties, the Court noted, are so basic as to be obvious. For instance, all counsel representing criminal defendants have a "duty to advocate the[ir] defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the

course of the prosecution." *Id.* at 688, 104 S.Ct. at 2065.

■ It must be remembered, however, that, regardless of the behavior of counsel, the focus of any reviewing court's analysis must be on the fairness of the trial itself. It is not "the purpose of the effective assistance guarantee of the Sixth Amendment ... to improve the quality of legal representation, although that is a goal of considerable importance to the legal system.... The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 689, 104 S.Ct. at 2065.

■ Thus, even if counsel's behavior manifests a total lack of concern for his client and clearly falls far below acceptable professional norms, his client's ineffectiveness claim will fail if she suffered no prejudice from her attorney's behavior. In fact, under *Strickland,* the reviewing court need not even consider counsel's behavior, if it first determines that no prejudice was suffered by the defendant. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. at 2069.

■ By the same token, even if the most well-intentioned lawyer earnestly pursues a strategy that he believes to be in the best interest of his client, an ineffective assistance of counsel claim will lie if that strategy is objectively unreasonable under professional norms, and as a result, his client suffers prejudice. Such was the case in John Patten's representation of Sheila Ryan DeLuca during her murder trial in the Supreme Court of New York, Bronx County.

It is clear from his testimony at the evidentiary hearing that Patten believed and continues to believe in DeLuca's innocence. Driven by that belief, the record reveals that he zealously attempted to secure his client's acquittal. However, when representing a client, zeal can prove to be a liability if it

eclipses the concerns and wishes of the defendant and leads to the stubborn pursuit of an objectively unreasonable strategy. If the pursuit of the objectively unreasonable strategy leads counsel to breach his duty to make a "thorough investigation of [the] law and facts relevant to plausible options," and to inform and consult with his client about important decisions, then counsel has failed to render effective assistance. *Id.* at 690–91, 104 S.Ct. at 2066.

According to Patten's testimony, he believed that there were two possible defense theories from the very beginning. First, he could argue that the State failed to prove its case beyond a reasonable doubt. Second, he could claim that DeLuca acted in self-defense. Ultimately, he decided to pursue the former strategy. In so doing, Patten seriously overestimated the effectiveness of the reasonable doubt defense, and likewise, grossly underestimated the strength of the State's case against his client. As a result, the jury was given no theory—other than the State's—to consider in evaluating the strong circumstantial evidence implicating DeLuca.[14]

DeLuca contends in this habeas petition that her counsel's erroneous reliance on the strength of his "whodunit" defense deprived her of her right to present a "factually compelling, and legally viable defense that likely would have resulted in an outright acquittal or, at worst, a manslaughter conviction." Specifically, she argues that Patten failed to explain the possibility of pursuing an extreme emotional disturbance ("EED") defense, and likewise, failed to advise her that she had the ultimate right to decide whether or not she would testify on her own behalf.

■ This Court is well aware that it must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Mindful that it must make every effort to eliminate the distorting effects of hindsight, this Court nonetheless

---

**14.** Judge Tonetti summed up the power of the prosecution's theory during a discussion on the admissibility of Flora Colao's testimony.

    That this defendant had access to the deceased, was last seen with the deceased, left the vicini-

ty of the deceased prior to his demise, and that her gun killed him. That's the theory of the prosecution.

finds that counsel's failure to adequately consider and inform his client of an important defense option in the face of the prosecution's damning evidence resulted in a "breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. at 2069. It is not hindsight that allows this Court to conclude that Patten's failure to understand the significance of the EED defense was tantamount to deficient assistance, it is common sense.

A. Extreme Emotional Disturbance [15]

At the hearing before Magistrate Judge Roberts, Patten testified that, although he could not recall her reaction to the suggestion, he had discussed the EED defense with DeLuca. He was certain of this fact because in order to discuss the murder charge she faced, he had to read New York State's murder statute. Since the EED defense is listed in the statute under Subdivision 1, he had to tell her it existed. While sure that they discussed the EED defense, Patten stated "[w]hether she understood me or not, I don't know." When asked by Magistrate Judge Roberts what ultimately caused him to abandon this defense option, Patten answered that it was because DeLuca had an "absolute aversion to meeting with psychiatrists."

According to DeLuca's testimony, Patten discussed a possible insanity defense which he referred to as "EEP" or "EDP." [16] Patten illustrated how this potential defense would work by recounting the story of a police officer who had shot a young boy. He told DeLuca that the officer successfully asserted the defense and as a result, he was institutionalized for less than a year. Since petitioner did not consider herself to be "crazy," she told Patten that she would not consent to any type of insanity defense. In her

view, there was no way "that anyone could deem me insane."

In her Report, Magistrate Judge Roberts resolved this apparent conflict between the accounts of Patten and DeLuca by crediting Patten's testimony and rejecting DeLuca's assertion that she was not informed of the EED defense, as she now understands it, prior to trial. The Report concluded that Patten did not pursue the EED defense because "the successful assertion of the [EED] defense is difficult, if not impossible, without [psychiatric evidence] and petitioner refused to meet with a psychiatrist."

After reviewing the entire record *de novo*, this Court agrees with petitioner's assertion that the Report's findings are contrary to the weight of the evidence presented. Although this Court believes that Patten made some reference to the EED defense in his early discussions with his client, it is not convinced that he adequately explained the option to DeLuca, nor is it persuaded that he, himself, completely understood the defense. Furthermore, the Court does not accept Patten's purported rationale for failing to pursue the option of an EED defense, especially when the facts of this case so obviously demanded it.

Much of the testimony at the hearing suggests that Patten never fully comprehended the usefulness of the EED defense. When asked by the magistrate judge whether it was he or DeLuca that had ultimately made the decision not to pursue an EED defense, Patten replied, "I don't believe we ever decided to present it at all, Judge. We were going with the—either no defense, or the defense of justification."

After initially discussing the possible defenses with DeLuca, Patten testified that he

---

**15.** The EED defense is available to an individual whose mental state does not rise to the level of "insanity," but who "is exposed to an extremely unusual and overwhelming stress," and "has an extreme emotional reaction to it as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *People v. Shelton*, 88 Misc.2d 136, 385 N.Y.S.2d 708, 717 (1976). Unlike the older "heat of passion" defense, the EED defense does not require the defendant to act spontane-

ously and immediately after exposure to the stress or trauma. Thus, a "cooling off" period is not fatal to an EED defense. *See People v. Patterson*, 39 N.Y.2d 288, 302–03, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976).

**16.** Petitioner thought she remembered Patten calling it the "EDP" defense because she recognized that terminology as police shorthand for emotionally disturbed person.

consulted with Dr. Daniel Schwartz, a psychiatrist, "to explore what was the state of [DeLuca's] mind at the moment that trigger was pulled." Presumably, it was with Dr. Schwartz that Patten explored the psychiatric defenses available to DeLuca. However, the notes Dr. Schwartz took during his consultation with Patten make no mention of an EED defense. Rather, they focus once again on what Patten appears to have determined were the only viable defenses. Page five of Dr. Patten's notes state:

2 possible defenses:

1) no proof beyond a reasonable doubt
2) self-defense

On the final page of his notes, Dr. Schwartz wrote "psychiatric issue—would it be unreasonable for her to believe he was lunging at her and she had to defend herself." This documentary evidence strongly suggests that Patten was not actively investigating the EED defense at the time he consulted with Dr. Schwartz and seriously undermines the Report's finding that Patten's only reason for deciding not to pursue the EED defense was that DeLuca refused to meet with Dr. Schwartz.

In addition, DeLuca's version of events is buttressed by the testimony of other witnesses at the hearing who were privy to attorney-client conversations between Patten and DeLuca. Frank GaNun, Patten's law partner, testified that after hearing DeLuca's account of the rape and shooting, he and Patten had several discussions about potential defenses.[17] However, GaNun had no recollection of any discussions concerning an EED defense and he testified that he did not believe that he was ever a participant in such discussions.

Nor did Ellen Yaroshefsky, a lawyer specializing in battered women's self-defense cases, who met with Patten and petitioner in late 1982 or early 1983 to discuss possible defense strategies. Yaroshefsky testified that the EED defense was never mentioned during that meeting. Flora Colao, who had met with Patten several times prior to trial, both with and without DeLuca present, testified that Patten never discussed the EED defense strategy. If he had, she was certain that she would have recognized it since the EED defense had been used in a case on which she had recently consulted.

Of course, none of this testimony, on its own, is dispositive in determining whether or not Patten fulfilled his duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution," or his duty to make a "thorough investigation of [the] law and facts relevant to plausible options." *Strickland*, 466 U.S. at 688, 690, 104 S.Ct. at 2065, 2066. Patten could have fully researched the EED defense and discussed it privately with DeLuca. Nonetheless, the absence of any mention of the EED defense in the presence of others involved in the preparation of DeLuca's trial defense must militate in favor of crediting her version of events and cast doubt on the accuracy of Patten's recollection.

■ This Court is also not persuaded by the magistrate judge's conclusion that Patten's reason for failing to pursue the EED defense was DeLuca's "absolute aversion to going to psychiatrists" and her refusal "to meet with Dr. Schwartz or, for that matter, any psychiatrist." As Magistrate Judge Roberts correctly stated, psychiatric testimony, although often helpful, is not legally necessary to establish the EED defense in New York State. *People v. Moye*, 66 N.Y.2d 887, 498 N.Y.S.2d 767, 769, 489 N.E.2d 736 (1985). Thus, even if Patten's factual allegations were true, it would not necessarily excuse him from failing to pursue this option.

---

**17.** Like Patten, GaNun was attracted to the justification defense and the two considered whether they should present a case of self-defense, using DeLuca's testimony as support. GaNun remembered that he and Patten had no concerns about DeLuca's credibility. According to GaNun, DeLuca was prepared to testify and both he and Patten planned to have her take the stand.

Likewise, he considered Peter DeLuca to be a credible eye witness to the shooting. In addition to several character witnesses, he recalled that Karyn Travelina was a witness who could corroborate DeLuca's version of the events at the after-hours club. GaNun also testified that he did not recall any evidence that suggested that Mr. DeLuca was responsible for the shooting. Nor did DeLuca ever suggest to him that her husband had pulled the trigger.

More troublesome, however, is that Patten's claim that DeLuca had an "absolute aversion" to psychiatrists is contrary to other evidence in the record. For instance, DeLuca met willingly with Colao, a therapist whose interaction with petitioner was comparable to any session with a psychiatrist. Furthermore, DeLuca testified that she underwent psychiatric treatment when she was first incarcerated at Riker's Island. Viewed in its entirety, the evidence suggests that DeLuca was "absolutely adverse" to an insanity defense, not to psychiatrists. According to petitioner's testimony, she told her attorney, "if you want me to talk to a psychiatrist, I'll talk to a psychiatrist." If Patten wished her to visit Dr. Schwartz in order to prepare an EED defense, the Court believes DeLuca would have done so willingly.

In rejecting DeLuca's assertion that Patten led her to believe that EED was a type of insanity defense, the magistrate judge found that "[i]n light of petitioner's training and experience as a police officer, her claims that she did not understand the difference between an EED defense and an insanity defense is simply incredible." This Court does not share the magistrate judge's incredulity and finds her reasoning flawed.

Although DeLuca served 15 years as a New York City police officer, neither her training nor her experiences introduced her to the intricacies of murder defense theories. Her legal training is limited to that which she received at the police academy in 1967—approximately 15 years before her arrest. The magistrate judge noted that as part of her training, "she had a penal law book and learned to properly cite crimes." However, this fact, standing alone, cannot support a finding that petitioner understood the fine distinction between an insanity defense and the EED doctrine. DeLuca spent most of career as a youth officer working with juveniles. She had virtually no experience testifying in court and there is absolutely no suggestion in the record that she had ever aided any homicide prosecutions where she might have come across the EED defense.

Assuming all police officers have a detailed knowledge of the various legal defenses available in homicide prosecutions is akin to expecting all lawyers, be they merger and acquisitions specialists or public defenders, to be familiar with the booking procedures at local precincts. It is true that police officers and lawyers are both part of the criminal justice system. However, they are separate and discrete parts and each serves a distinct function. The knowledge that each part must have in order to serve its function is limited by its particular role in the system. Thus, while knowledge of the distinction between an EED defense and an insanity defense may be essential to a defense attorney in order to fulfill his role as an effective representative of an accused murderer, it is unnecessary for a police officer to fulfill her role as enforcer of society's laws. Consequently, such knowledge cannot be imputed to DeLuca merely because she happens to be a former police officer.

Based on her findings of fact, the magistrate judge concluded that DeLuca "clearly understood the EED option, and rejected it because of her aversion to psychiatrists, because it would have required her to admit the shooting, and because even if successful, the EED defense would have resulted in a manslaughter conviction." However, these conclusions are likewise contrary to the evidence.

DeLuca testified that, throughout the case, she intended to tell her version of Bissett's shooting, and made that desire "very clear." Several witnesses corroborated her on this point, including GaNun, who testified that he and Patten had intended to have her testify. This evidence contradicts the magistrate judge's conclusion that she would have forsaken the EED defense because "it would have required her to admit the shooting."

Most damning to Patten's asserted rationale for abandoning the EED defense option, however, is his admitted intention of pursuing the justification defense. As is the case with the EED defense, psychiatric testimony is not legally necessary to present a justification defense. Nonetheless, the testimony of a noted psychiatrist would have been very helpful in explaining why DeLuca feared for her life, despite the fact that she was the one who had the gun. Obviously Patten thought so, since he consulted Dr. Schwartz about

this very issue.[18] Yet, despite DeLuca's supposed aversion to psychiatrists and Patten's repeated concerns about the time gap between the rape and the shooting, he continued to consider the justification defense a viable option right up to the point the defense rested.

In addition, the justification defense would also have required DeLuca to admit to the shooting. Thus, it is unreasonable to assume that DeLuca abandoned the EED defense because of this consequence while, at the same time, she eagerly awaited the chance to pursue her self-defense claim in spite of it.

It is equally unpersuasive that petitioner would have rejected the EED defense because it would, at best, have resulted in a manslaughter conviction. Presumably, petitioner would have presented the EED defense in tandem with a justification defense. Thus, once the decision was made to present petitioner's testimony, the inclusion of an EED defense would have merely allowed DeLuca to be convicted of a less severe offense had her justification defense failed. However, a decision to pursue the EED strategy would not have foreclosed the possibility of an outright acquittal—either under the justification doctrine or the principle of jury nullification.

It should have been plainly obvious to Patten that his client understood the EED option to be an insanity defense, or, at the very least, was confused about its operation. This Court believes that petitioner's confusion was the result of her attorney's failure to adequately explain the EED defense to his client. However, even accepting Patten's assertion that he explained the option to DeLuca, his hands-off disclaimer "[w]hether she understood me or not, I don't know," evidences an insufficient attempt to meaningfully "consult with his client on [an] important decision." *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2065.

■ Nor can it be doubted that petitioner was prejudiced by this failure of her counsel. Had DeLuca been properly advised concerning the EED defense, there is every reason to credit her claim that she would have testified, hoping for an outright acquittal, but willing to accept a manslaughter conviction under the EED doctrine as an alternative option. Presentation of the EED defense would have been perfectly consistent with DeLuca's often expressed desire to take the stand and tell her side of the story.

Given the vast array of weapons in the defense arsenal, this Court is convinced that, had DeLuca testified, there is at least a reasonable probability that "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. In addition to humanizing her presence before the jury, DeLuca's testimony would have: 1) provided the jury with an explanation of her behavior during the morning and early afternoon of September 22, 1982; 2) called into question the credibility of the State's two star witnesses, Murphy and Barrett; 3) completely contradicted the State's theory about both the timing and the circumstances surrounding the shooting; 4) explained why Bissett was shot with her weapon; and, 5) revealed why her husband had called the police to report the shooting. Most importantly, her tale of abduction and rape would have provided the jury with evidence to consider in determining whether DeLuca was, in fact, suffering from an extreme emotional disturbance at the time of the shooting.

Judging by the testimony given at the evidentiary hearing, DeLuca would have been a very compelling witness. Patten's investigation into his client's background revealed that she had no prior criminal record, and both Patten and GaNun testified that they had no reason to fear her impeachment based on anything in her past. In addition to her fifteen years as a New York City policewoman, she had served as a nun, schoolteacher, and basketball coach. Many of the people whom she knew from those experiences, including police officials, former teachers, and members of the Franciscan order, were willing to testify about her good

---

**18.** As previously noted, Dr. Schwartz's notes indicated on the final page, "psychiatric issue— would it be unreasonable for her to believe he was lunging at her and she had to defend herself."

character and reputation as a truthful and honest member of the community.

In addition, DeLuca's testimony would not have stood alone. Peter DeLuca, a twenty-eight year veteran of the police force, was an eyewitness to the shooting and could have verified his wife's account of the events of that afternoon and early evening. In support of both a justification defense and an EED defense, Mr. DeLuca could have described his wife's fragile emotional and physical state when he returned home after driving O'Byrne home. He also could have confirmed that he and his wife returned to the scene of the rape at his insistence, and that the shooting was not a cold-blooded, premeditated murder. Like his wife, Mr. DeLuca probably would have been an impressive witness. Both defense counsel testified that they were unaware of anything in Mr. DeLuca's background that might have called his credibility into question.

Karyn Travelina could have confirmed DeLuca's account of the hostile nature of their initial meeting with Bissett, Barrett, and Murphy at the after hours club, as well as the fact that they left separately and that Travelina was never in the same car as Bissett. This testimony would have rebutted important aspects of the testimony given at trial by Barrett and Murphy.

Travelina also could have testified about meeting DeLuca as she was driving home on the afternoon of September 22. In that meeting, DeLuca allegedly told her that she had been raped, and pleaded with Travelina not to discuss it with anyone. Combined with the testimony of Flora Colao, the rape trauma expert, this testimony would have rebutted the prosecution's theory that DeLuca's behavior and demeanor following the alleged assault were inconsistent with that of a rape victim, and that her rape complaint, filed with Sergeant Eberhardt, was a fabricated exculpatory statement evidencing a guilty mind. In addition, DeLuca told Travelina that she did not have her gun at the time, even though under the prosecution's theory the shooting had already occurred. Finally, Travelina could have testified that she saw no gun in DeLuca's possession.

Colao's testimony would have been useful, not only in explaining DeLuca's behavior after the rape, but in strengthening her affirmative defense claim of extreme emotional distress. According to Colao, rape victims who encounter their assailant hours after the initial incident commonly suffer a retrauma. This retriggering event wrenches the victim out of denial. Colao testified that the shock may cause a victim to fall apart or go into a rage.

Patten also had medical and physical evidence which he could have presented to corroborate DeLuca's account of abduction and rape. In addition to the medical testimony introduced by the prosecution at trial, which suggested that DeLuca and Bissett had engaged in oral and vaginal sex, Patten could have offered the testimony of Dr. Guidetti, the physician who examined DeLuca the night she reported the rape to the police. Dr. Guidetti, as well as her attending nurse, could have testified that DeLuca suffered vaginal redness and bleeding. Furthermore, Patten could have argued that petitioner's claim of forcible rape was substantiated by her torn underwear. Evidence of that claim could also have been entered in the form of photographs, taken shortly after the incident, which showed bruising on DeLuca's body, and the affidavit of Dr. Clyne, which stated that he did not believe that the bruises on her breasts and thighs were self-inflicted.

DeLuca's version of events was also supported by the physical evidence at the scene of the shooting. Bissett had been found fully dressed, facing forward, with his head between the two front seats of the van. Four bullet holes were found in the right hand side of his head, one of which entered towards the front of his head and exited out the back. The blood found in the van was located in the front section. The driver's side door to the van was open, as were the windows of both doors, which should have made gunshots fired inside the van audible. This description of both the body and van seems oddly incompatible with the State's theory that DeLuca shot Bissett immediately after they had enjoyed consensual sex. Conversely, it seems perfectly consistent with DeLuca's claim that she shot Bissett, well after the rape, from

outside the right-hand side, front door of the van.

Evidence of DeLuca's sexual orientation could have been useful in attacking the prosecution's theory that DeLuca had willingly accompanied three strange men to an adult motel because she was interested in having sex with one or more of them. In fact, Patten testified at the hearing that he considered the question of DeLuca's sexuality a "major part" of a potential defense, because, if petitioner was not a heterosexual, it "made no sense whatsoever" for her to initiate a sexual encounter with Bissett and his two friends. The platonic nature of her marriage to Mr. DeLuca may also have refuted the prosecution's insinuation that she was being unfaithful to her husband.

Finally, Patten may have attempted to admit evidence of prior similar conduct by Bissett in order to bolster petitioner's EED claim. While much of the information that Patten and DeLuca uncovered would clearly have been inadmissible at trial, the testimony of Elizabeth Kochovos may have been admitted in conjunction with a justification defense to show DeLuca's state of mind at the time of the shooting.[19]

This Court has no doubt that, had an EED defense been presented, the result of the proceeding would have been different. DeLuca's account of her abduction and rape would clearly allow the jury to find that she had "been exposed to an extremely unusual and overwhelming stress" and had "an extreme emotional reaction to it, as a result of which, [she suffered] a loss of self-control and [her] reason [was] overborne by intense feelings, such as passion, anger, distress ... or other similar emotions." *People v. Shelton,* 385 N.Y.S.2d at 717. The overwhelming amount of corroborating evidence that Patten would have been able to present in support of that account creates at least a reasonable probability that the jury would have found her version credible.

Given these circumstances, the EED defense was obviously a potentially meritorious defense strategy that deserved serious consideration.

A strong case can indeed be made that failure to advise a criminal defendant of the availability of an affirmative defense when facts known to an attorney suggest that the defense may be meritorious does not constitute "reasonably effective assistance" when judged "under prevailing professional norms."

*Mitchell v. Scully,* 746 F.2d 951, 954 (2d Cir.1984) (quoting *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066). In this case, with facts that made the EED defense such a compelling option, Patten had a duty to make sure his client fully understood the benefits and costs of that strategy, before he rejected the option. In failing to do so, Patten rendered ineffective assistance to his client.

### B. *Right to Testify*

Petitioner's second argument in this petition is that she was deprived of the effective assistance of counsel by her attorney's failure to inform her that the ultimate right to decide whether or not to testify belonged personally to her and not to her lawyer. In other words, DeLuca claims that she was never told that, notwithstanding her attorney's strong recommendation to the contrary, she had the right to decide to testify. Indeed, there does not seem to be any factual dispute regarding her assertion.

According to the testimony provided at the evidentiary hearing, the decision not to present a defense was made over lunch during a trial recess. DeLuca contends that Patten indicated that the State had failed to meet its

19. Respondents argue that all of this evidence, including Kochovos' testimony, would have been inadmissible under *People v. Miller,* 39 N.Y.2d 543, 384 N.Y.S.2d 741, 747, 349 N.E.2d 841, 847 (1976), which requires the defendant to have knowledge of the victim's prior violent acts in order to have them admitted at trial. Since petitioner discovered Bissett's previous acts after the shooting, they argue, she cannot claim that they had an impact on her mental state.

Petitioner would likely argue that the threats Bissett and his friends made to DeLuca during their car ride gave her the requisite knowledge of their previous acts. Whether this would be sufficient to meet the standard of *Miller* is a matter for the trial court to decide. It is sufficient for this Court's review that Patten could have reasonably attempted to have this evidence admitted, and had it been, it could have helped petitioner's cause.

burden of proof and that the case was won. DeLuca testified that she was very surprised at Patten's decision, because she had always wanted and expected to testify. She felt that the jury needed to hear her explanation of the events of September 21 and 22, 1982 in order to understand what happened. However, since she believed that her attorney had the authority to decide whether or not she would testify, she yielded to his advice, despite her reservations about his optimistic outlook.

While Patten was understandably unable to recall the specific meal at which this discussion took place, he did remember that he was the one who made the decision not to present a defense after he determined that Justice Tonetti was not going to let Flora Colao testify. According to Patten, Colao's testimony would have functioned as a backdrop in which DeLuca's story would be met with sympathy. Since he was unwilling to have DeLuca take the stand without the benefit of Colao's testimony, Patten decided to rest. More importantly, he believed that the "whodunit" defense was "going to fly."

Patten testified that he made this decision for purely strategic reasons. He did not believe that DeLuca would perjure herself, nor did he have any concerns about her credibility as a witness.[20] When questioned on this issue at the evidentiary hearing, Patten stated "I believed Mrs. DeLuca's story then and I believe it today. And I had no doubts about it ... I had no doubt that if I put her on that stand, that she would do well. I didn't think [that the prosecution proved its case]. It was that simple."

Patten recalled himself saying, "Sheila, I'm not putting you on the stand," a decision in which DeLuca eventually "acquiesced." He testified that, in the midst of a trial, he is very "strong willed" and very clear as to whether he wants his clients to testify or not, because he figures, "I'm trying the case, it's

their life but I'm trying the case." However, he would never prevent his clients from testifying if they "persist" in demanding to exercise the right. "If they don't persist, many times they are just following what I tell them to do."

Although the testimony of DeLuca and Patten was not consistent in all respects, they agreed on one point critical to this habeas application. At the hearing, Patten candidly admitted that he had never explicitly told DeLuca that it was ultimately her right to decide whether or not to testify in her own defense. The question this Court must now decide is whether, in failing to do so, Patten rendered constitutionally ineffective assistance.

*1) Is the right to testify fundamental?*

■ In *Rock v. Arkansas,* 483 U.S. 44, 49–53, 107 S.Ct. 2704, 2707–2709, 97 L.Ed.2d 37 (1987), the Supreme Court held that criminal defendants have a constitutional right to testify in their own behalf rooted in the Fifth, Sixth, and Fourteenth Amendments. The precise nature of that right, however, is still uncertain in the Second Circuit. As the magistrate judge correctly pointed out in her Report, little has been written by the Supreme Court or this Circuit to explicitly flesh out the implications of *Rock.*[21]

However, in *United States v. Vargas,* 920 F.2d 167 (2d Cir.1990), the Second Circuit decided to publish its opinion rather than decide it by summary order solely "to express [its] substantial doubt about the correctness" of the prosecution's "proposition that a defendant's failure to object at trial to counsel's refusal to allow him to take the stand constitutes a waiver of the defendant's constitutional right to testify on his own behalf." *Id.* at 170. The Second Circuit's opinion in *Vargas* appears to indicate that the court is leaning towards finding that the

---

**20.** DeLuca testified that Patten told her that he did not believe that anyone could honestly impeach her. However, he was concerned that, if she testified, the prosecution might put someone on the stand who would lie about her character, in the same way that Barrett and Murphy lied during the State's case.

**21.** While the Second Circuit has yet to speak on the nature of the constitutional right to testify, it has previously recognized that "the statutory 'privilege' to testify in one's own behalf has come to be recognized as having an importance similar to the right to be present at one's trial and to present a defense." *United States v. Bentvena,* 319 F.2d 916, 943 (2d Cir.1963).

right to testify may be fundamental in nature and hence, personal to the defendant. However, since resolution of that question was not necessary to decide the case, the Second Circuit "le[ft] that issue for another day." The facts of this habeas petition have now put that issue squarely before this Court.

*Rock*, itself, emphasizes that the right to testify "is one of the rights that 'are essential to due process of law in a fair adversary process'" and that it is "[e]ven more fundamental to a personal defense than the right of self-representation." *Rock v. Arkansas*, 483 U.S. at 51–52, 107 S.Ct. at 2709 (quoting *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975)).

Furthermore, the Supreme Court acknowledged that "[o]n numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right." *Rock v. Arkansas*, 483 U.S. at 53 n. 10, 107 S.Ct. at 2710 n. 10. One such occasion was *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), in which the Supreme Court held that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Id.* at 751, 103 S.Ct. at 3312. *See also Nix v. Whiteside*, 475 U.S. 157, 164, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986) ("[a]lthough this Court has never explicitly held that a criminal defendant has a due process right to testify in his own behalf ...

the right has long been assumed"); *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2510 n. 1, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring) ("Only such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make."); *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) ("whether the defendant is to testify is ... a matter of constitutional right."); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.").

■ This Court finds that *Rock*, especially when read in light of the Supreme Court's earlier precedent, supports the contention that the right to testify is indeed fundamental in character.[22] As a fundamental constitutional right, the right to testify is personal to the defendant and may not be waived by counsel on the defendant's behalf, regardless of strategic or tactical considerations. Furthermore, as is the case with other fundamental constitutional guarantees, waiver of the right to testify must be both knowing and voluntary. *Cf., e.g. Boykin v. Alabama*, 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969) (defendant's guilty plea must be made intelligently and voluntarily because it implicates fundamental constitutional rights); *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (waiver of right to counsel must be made intelligently and competently).

---

**22.** The fundamental nature of the right to testify is also embodied in the American Bar Association's Standards for Criminal Justice ("ABA Standards") and the American Bar Association's Model Rules for Professional Conduct ("ABA Model Rules"). For example, the ABA Standards provide:

(a) *Certain decisions* relating to the conduct of the case are *ultimately for the accused* and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:

(i) what plea to enter;

(ii) whether to waive jury trial; and

(iii) *whether to testify in his or her own behalf.*

1 Standards for Criminal Justice Standard 4–5.2(a) (2d ed.1980) (emphasis added).

Commentary to this provision further states that "because of the *fundamental nature* of these three decisions, so crucial to the accused's fate, the accused must make the decisions." *Id.* commentary. (emphasis added).

Likewise, Rule 1.2(a) of the ABA's Model Rules states:

In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

Since this petition raises an ineffective assistance of counsel claim, these professional standards are particularly probative in determining the adequacy of counsel's conduct. *Strickland* 466 U.S. at 688, 104 S.Ct. at 2065.

While the Second Circuit has not yet considered the nature of the right to testify, the vast majority of circuit courts which have addressed this question have explicitly held that the right to testify is fundamental. *See e.g., Foster v. Delo,* 11 F.3d 1451 (8th Cir. 1994); *United States v. Moody,* 977 F.2d 1425, 1430 (11th Cir.1992); *United States v. McMeans,* 927 F.2d 162, 163 (4th Cir.1991); *Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.), *cert. denied,* 498 U.S. 831, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990); *United States v. Martinez,* 883 F.2d 750, 754–55 (9th Cir. 1989); *vacated on other grounds,* 928 F.2d 1470 (9th Cir.), *cert denied,* 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991); *Galowski v. Murphy,* 891 F.2d 629, 636 (7th Cir.1989); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987); *see also, Lema v. United States,* 987 F.2d 48, 53 n. 4 (1st Cir.1993) (assuming, without deciding, that the right to testify is fundamental and may not be waived by counsel).

Perhaps the most comprehensive examination of this issue was undertaken by the Eleventh Circuit in *United States v. Teague,* 953 F.2d 1525 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992). In *Teague,* the court exhaustively reviewed the development of the right to testify and reaffirmed that it is a recognized fundamental constitutional right, personal to the defendant, and one that cannot be waived by the trial court or defense counsel. *Teague* relied on *Rock's* holding that the right to testify is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony" and added that "[u]nder the Supreme Court's reasoning in *Rock,* the right to testify essentially guarantees the right to ultimately choose whether or not to testify." *Id.* at 1525 (quoting *Rock v. Arkansas,* 483 U.S. at 52, 107 S.Ct. at 2709.).

A criminal defendant clearly cannot be compelled to testify by defense counsel who believes it would be in the defendant's best interest to take the stand. It is only logical, as the Supreme Court has recognized, that the reverse also be true: A criminal defendant cannot be compelled to remain silent by defense counsel.

*United States v. Teague,* 953 F.2d at 1525.

While case law clearly demonstrates that the right to testify is fundamental, the more difficult question concerns what actions must be taken by courts and counsel to protect that right. In *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the Supreme Court emphasized the importance of protecting fundamental constitutional rights during the course of a trial.

It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence of the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.

*Id.* at 464, 58 S.Ct. at 1023 (citations omitted).

Three suggested methods have been developed in case law and academic literature to protect the defendant's fundamental right to testify. The first, adopted by the majority in *Teague,* holds the defense attorney primarily responsible for safeguarding his client's right to testify. Under this theory, an ineffective assistance of counsel claim, on either direct or collateral review, is the proper remedy for any violation of that right. While assuring that the defendant's waiver of her right is both knowing and voluntary, this model would prevent the court from invading the attorney-client relationship or unintentionally inducing the defendant to abandon her right to remain silent. *See also, Foster v. Delo,* 11 F.3d 1451, 1456–59 (8th Cir.1994).

The second method places the burden of protecting the right to testify on the trial courts. Analogizing to the protections afforded other fundamental constitutional rights, this approach would employ the procedural safeguard of an on-the-record colloquy between the trial judge and the defendant to ensure that waiver of the right is both knowing and intelligent. *See Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969) (holding that the record must affirmatively show that the defendant validly waived those constitutional

1356

rights necessarily waived by entry of a guilty plea, including the right to go to trial and the right to trial by jury); *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962) (requiring evidence that showed that the "accused was offered counsel, but intelligently and understandingly rejected the offer"); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (on the record colloquy required to waive jury trial); *Johnson v. Zerbst*, 304 U.S. 458, 458, 58 S.Ct. 1019, 1019, 82 L.Ed. 1461 (1938) ("whether there is a proper waiver [of the right to counsel] should be clearly determined by the trial court and ... that determination [should] appear upon the record.")

In addition to protecting the defendant's fundamental right, the existence of an on-the-record waiver would have the added benefit of "foreclosing subsequent collateral proceedings" that would become "an after-the-fact swearing contest between the defendant and counsel as to whether the defendant validly waived the right to testify." *United States v. Teague*, 953 F.2d at 1544. (Clark, J., concurring in part and dissenting in part). *See also, United States v. Martinez*, 883 F.2d 750, 764 (9th Cir.1989) (Reinhardt, J., dissenting), vacated, 928 F.2d 1470 (9th Cir. 1991); *Hollenbeck v. Estelle*, 672 F.2d 451 (5th Cir.1982) (noting that state trial judge's colloquy with defendant was "a model of appropriate judicial concern for the constitutional rights of a criminal defendant.").

Finally, the third approach ultimately rests the burden of protecting the fundamental right to testify on the defendant, herself. Under this theory, the right to testify, merely a subordinate reciprocal right of the right to remain silent, does not attach until the defendant affirmatively asserts it in court. Any failure on the part of the defendant to affirmatively act to protect that right constitutes a valid waiver. *See, United States v. Bernloehr*, 833 F.2d 749, 752 (8th Cir.1987). *United States v. Teague*, 953 F.2d at 1537–41 (Birch, J., concurring in judgment). This model seems to ignore the requirement that waiver of a fundamental right must be both knowing and voluntary. Clearly, a defendant who is unaware that she has a right to assert

her desire to testify over her attorney's wishes cannot be deemed to have waived her right knowingly and voluntarily.

Petitioner claims that it was her counsel's failure to inform her of her rights that deprived her of her ability to knowingly and voluntarily choose whether to testify. Following the logic of the *Teague* majority, petitioner argues that the proper vehicle to vindicate her right to testify is a claim of ineffective assistance of counsel. In *Teague*, the court articulated the minimum duty that counsel owes to his clients by stating, "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *United States v. Teague*, 953 F.2d at 1533. Such advice is "crucial," the court held, "because there can be no effective waiver of a fundamental constitutional right unless there is an 'intentional relinquishment or abandonment of a *known* right or privilege' " *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added)).

Accordingly, the court held that

*if defense counsel never informed the defendant* of the right to testify, and *that the ultimate decision belongs to the defendant,* counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary. Under such circumstances, defense counsel has not acted within the range of competence demanded of attorneys in criminal cases, and the defendant clearly has not received reasonably effective assistance of counsel.

*Id.* at 1534 (quoting *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064) (emphasis added).

At the same time, however, the court held that "if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the advice of competent counsel." *Id.* at 1533 (footnote omitted).

Applying these principles to the case before it, the court in *Teague* found that "the evidence fail[ed] to show that the Defendant's will was 'overborne' by his counsel. The Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest." *Id.* at 1534–35. However, unlike Patten, Teague's counsel testified at the evidentiary hearing that she had probably explained "that whether [Teague] would testify ultimately would be his decision." *Id.* at 1528.

Petitioner argues that, since Patten concedes that he never informed her that she had the final right to decide whether or not to testify, this Court should apply the holding of *Teague* and find that her counsel did not act "within the range of competence demanded of attorneys in criminal cases." *Id.* at 1534.[23]

#### 2) *Is there a procedural bar to applying the rule of Teague to DeLuca?*

██ Magistrate Judge Roberts noted in her Report that "if this court were to hold that the failure to advise a defendant that the ultimate decision regarding whether to testify belonged to her is outside the range of competence demanded of attorneys in criminal cases, it would be announcing a new constitutional rule of criminal procedure in violation of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)."

Petitioner objects to this finding, arguing that it has been established for years that the accused, not counsel, has the ultimate right to decide whether to testify. Thus, a holding that counsel's failure to inform a client of this fundamental right falls outside the bounds of competent representation would not be a "new" rule, but rather an application of settled precedent.

It is clear that "habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review through one of the two exceptions we have articulated." *Teague v. Lane,* 489 U.S. at 316, 109 S.Ct. at 1078 (hereinafter *Lane*).[24] However, exactly what constitutes a new rule is not always easy to determine. According to Justice Harlan, whose earlier dissents later served as the foundation of the Court's opinion in *Lane:*

> The theory that the habeas petitioner is entitled to the law prevailing at the time of his conviction is, however, one which is more complex than the Court has seemingly recognized. First, it is necessary to determine whether a particular decision has really announced a "new" rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.... [M]any though not all, of this Court's constitutional decisions are grounded upon fundamental principles whose content does not change dramatically from year to year, but whose meanings are altered slowly and subtly as generation succeeds generation. In such a context it appears very difficult to argue against the application of the "new" rule in all habeas cases since one could never say with any assurance that this Court would have ruled differently at the time the petitioner's conviction became final.

*Desist v. United States,* 394 U.S. 244, 263–64, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

*Lane* provides some guidance for determining when a habeas petitioner should be denied the benefit of a new rule. "In general," the Court stated, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the

---

**23.** A few courts have already applied this logic. For instance, in *Foster v. Delo,* 11 F.3d 1451 (8th Cir.1994), the court held that the law is clear that the defendant has the ultimate authority to make the fundamental decision of whether or not to testify. Failure to inform the defendant of this right "impeded an informed decision whether to waive or invoke a fundamental constitutional guarantee." *Id.* at 156–59; *see also, United States v. Robles,* 814 F.Supp 1233, 1245 (E.D.Pa.

1993) (finding that counsel made it clear to defendant that the final decision on whether or not to testify was his alone).

**24.** In order to avoid confusion with *United States v. Teague,* another case continuously cited in this opinion, the Court will refer to *Teague v. Lane* as *Lane.*

Federal Government.... To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane,* 489 U.S. at 301, 109 S.Ct. at 1070. Addressing the concerns expressed by Justice Harlan in *Desist,* the Court distinguished new rules from those rules that are "merely applications of principles that were settled at the time of conviction." *Yates v. Aiken,* 484 U.S. 211, 216, 108 S.Ct. 534, 537, 98 L.Ed.2d 546 (1988).

Before determining whether the rule announced in *United States v. Teague* amounts to a "new" rule, it is important that this Court first clarify *Teague*'s holding. In imposing a duty on counsel to protect their clients' right to testify by ensuring that they are aware of that right and that it is ultimately their decision to make, the *Teague* majority did not establish a prophylactic rule, such as the one announced in *Miranda v. Arizona,* 384 U.S. 436, 467–473, 86 S.Ct. 1602, 1624–1627, 16 L.Ed.2d 694 (1966) (holding that, absent other effective measures to protect the Fifth Amendment privilege against self-incrimination, a person in custody must be warned prior to interrogation that he has certain rights, including the right to remain silent). There is no blanket requirement that counsel must explicitly warn all of their clients that they have the ultimate right to decide whether or not to testify.

Rather, reviewing courts must apply a preponderance of evidence test. If "the preponderance of credible evidence indicates that [the] defendant was fully aware, as a result of his discussions with counsel, that it was ultimately his decision whether to testify or not and that he agreed with counsel that it was not in his best interest to do so," then defense counsel has rendered effective assistance. *United States v. Palma–Rodriquez,* 819 F.Supp. 1064, 1066 (M.D.Fla.1993) (applying the holding in *Teague*). Conversely, if the preponderance of evidence leads to the conclusion that the defendant was unaware

that it was ultimately her decision to make, and counsel does not correct this misperception, then counsel has failed to render adequate assistance. This Court must now determine whether applying this interpretation of *Teague* amounts to the adoption of a new rule in violation of *Lane.*

As a threshold matter, this Court believes that the principle that the accused has the ultimate right to decide whether or not to testify is not a "new" rule within the meaning of *Lane.* While *Lane* did identify part of *Rock*'s holding—that a state cannot prevent the testimony of a defendant by the arbitrary application of its evidentiary rules—as a new rule, *Teague v. Lane,* 489 U.S. at 301, 109 S.Ct. at 1070, the same cannot be said for *Rock*'s recognition of the fundamental right underlying its decision. In fact, the language of *Rock* explicitly indicates that the Court was merely applying a well-settled principle in noting that there is a constitutional right to testify. "At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." [25] *Rock v. Arkansas,* 483 U.S. at 49, 107 S.Ct. at 2708.

Furthermore, in addition to the prior Supreme Court case law cited in *Rock* itself, many circuit courts had earlier applied the same logic that the Supreme Court would later use in *Rock* to find that the right to testify ultimately belongs to the defendant. *United States v. Curtis,* 742 F.2d 1070, 1076 (7th Cir.1984); *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 118–119 (3d Cir. 1977) (noting an "enlightened trend" in federal and state case law that teaches that "a criminal defendant's right to testify in his own defense is of such fundamental importance that no defendant" may be denied that right); *Winters v. Cook,* 489 F.2d 174, 178–179 (5th Cir.1973) (holding that the right to testify is "such an inherently personal fundamental right that it can be waived only by the defendant and not by his attorney.") [26]

---

**25.** *See also, United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987), which characterized *Rock* as "explicitly confirm[ing] that criminal defendants have a constitutional right to testify."

**26.** In addition, the American Bar Association's Standards for Criminal Justice and Model Rules for Professional Conduct have long counseled that the defendant must be the one to ultimately

Thus, this Court finds that at the time of her conviction, DeLuca had the ultimate right to decide whether or not to testify.

However, this holding is not enough to find that petitioner's counsel was ineffective. To do so, this Court must hold that counsel's failure to inform his client that she had the ultimate right to decide whether or not to testify falls outside the bounds of competent representation. Petitioner contends that this holding would not be a "new" rule. Rather, the Court would merely be applying the well settled precedent that a defendant's waiver of a fundamental constitutional right must be both knowing and voluntary. After all, petitioner argues, a defendant cannot knowingly and voluntarily waive her right to testify, if she is unaware that it is her decision to make. Indeed, as early as 1964, Judge J. Skelly Wright wrote:

> the right to testify is a basic right, and there is an obligation on the part of both the Court and trial counsel to inform the accused of his right to testify, if he so desires. Further, it is the duty of both to assure that the exercise of this basic right by the accused is a free and meaningful decision. *The right to testify is personal to the accused. He must make the ultimate decision on whether or not to take the stand.* In this regard, it is unlike other decisions, which are often called 'trial decisions,' where it is counsel who decides whether to cross-examine a particular document. Here it is the accused who must decide and *it is the duty of counsel to present to him the relevant information on which he may make an intelligent decision.*

*Poe v. United States*, 233 F.Supp. 173 (D.D.C.1964) (emphasis added).

Yet, as persuasive as petitioner's argument might be, it cannot withstand the Supreme Court's retroactivity analysis. *Lane*'s new rule definition has since been interpreted to include all rules whose validity under existing precedents is "susceptible to debate among reasonable minds." *Wright v. West*, —— U.S. ——, ——, 112 S.Ct. 2482, 2489, 120 L.Ed.2d 225 (1992) (quoting *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108

L.Ed.2d 347 (1990)). *But see, Wright v. West*, —— U.S. at ——, 112 S.Ct. at 2496 ("[T]he standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does not necessarily mean a rule is new.") (O'Connor, J., concurring in judgment). Clearly, few rules, if any, will fall outside this expansive definition. The disagreement among the judges concurring and dissenting in *Teague* illustrates that the rule petitioner wishes this Court to adopt is susceptible to debate among reasonable minds. Therefore, this Court must agree with the magistrate judge's finding that, to hold that counsel's failure to inform his client that she is the ultimate decision maker regarding whether or not to testify falls beyond the bounds of competence demanded of attorneys in criminal cases, would be to announce a new constitutional rule of criminal procedure.

■ However, the Supreme Court has established two exceptions to the general rule of nonretroactivity for cases on collateral review. *Teague v. Lane*, 489 U.S. at 311–313, 109 S.Ct. at 1075–1076. The first applies to rules that place certain types of individual conduct outside the realm of criminal punishment. This exception obviously does not apply to the facts of this petition. The second *Lane* exception "applies to new 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *United States v. Salerno*, 964 F.2d 172 (2d Cir.1992) (quoting *Saffle v. Parks*, 494 U.S. 484, 486, 110 S.Ct. 1257, 1259, 108 L.Ed.2d 415 (1990)).

The new rule, urged by petitioner, holding defense counsel responsible for informing his client that she has both the right to testify, and the ultimate authority to decide whether or not to take the stand, fits within the second *Teague* exception and thus can be adopted on collateral review. As previously noted, the Supreme Court held in *Rock* that the "accused's right to present his own version of events in his own words" is "essential to due process of law in a fair adversary system" and is "[e]ven more fundamental to a personal defense than the right of self-

decide whether or not to testify. *See, supra,* footnote 22.

representation." *Rock v. Arkansas,* 483 U.S. at 51–52, 107 S.Ct. at 2709 (internal quotation omitted). Furthermore, it cannot be doubted that a new rule protecting a defendant's right to testify "is central to an accurate determination of innocence or guilt." *Teague v. Lane,* 489 U.S. at 313, 109 S.Ct. at 1076. "Taking the stand is the defendant's opportunity, if he wants it, to face his accusers and the jury, tell his story, submit to examination, and exercise such ability as he may have to persuade those who will make a decision that may vitally affect his life." *Wright v. Estelle,* 572 F.2d 1071, 1081 (5th Cir.1978) (Godbold, J., dissenting).

■■■ Thus, this Court finds that defense counsel has the crucial responsibility of protecting his client's fundamental right to testify and assuring that any waiver of that right is both knowing and voluntary. Consequently, if counsel has failed to inform the defendant that the ultimate right to decide whether or not to testify belongs to the defendant, and the preponderance of credible evidence indicates that the defendant was not independently aware of this right, then counsel has rendered ineffective assistance to his client.

### 3) *Did petitioner knowingly and voluntarily waive her right to testify?*

■■■ In her report, Magistrate Judge Roberts found that DeLuca "was adequately advised of her right to testify, and ultimately agreed, perhaps reluctantly, with her attorneys' judgment that she should not testify." While this Court agrees with the magistrate judge that petitioner was aware of her right to testify, the Court does not believe that the evidence shows that she was aware that it was ultimately her decision to make.

The magistrate judge reached her conclusion by first noting that it was Patten's "general practice to inform his clients of their options and advise them of his opinion, but that he never made the decision for a client or stood in the way of a client intent on taking the stand." It was the magistrate judge's opinion that Patten could have reasonably concluded that an explicit statement of petitioner's right to decide was unnecessary given her participation in the many discussions on defense strategy and her fif-

teen years experience as a New York City police officer.

As was the case in discussing the EED defense, this Court does not find the argument that petitioner was aware of all her rights simply because she was a police officer persuasive. While her police experience may have taught her that defendants had a general right to testify, nothing in her training or experience as a police officer educated her as to the constitutional apportionment of decision-making authority within the attorney-client relationship.

In fact, a credible argument could be made in support of the opposite conclusion. Police officers are constantly advising people of their rights, rights that are often not asserted until the individual's attorney arrives at the police station. Defense lawyers are often seen as the nemesis of the police because they invoke rights that the police believe impede an investigation. Given the power attorneys appear to wield at the station house, it would not be surprising to find officers who believe that counsel possesses the ultimate authority to decide whether or not his client will testify.

■■■ At the evidentiary hearing, DeLuca testified that she thought her lawyer had the ultimate right to decide whether she would testify. Standing alone, this allegation would not suffice. A "barebones assertion" by a defendant that her counsel failed to inform her of her rights is insufficient to establish an ineffectiveness of counsel claim under *Strickland.* See *Underwood v. Clark,* 939 F.2d 473, 475–76 (7th Cir.1991). Without more, this Court would likely agree with the findings of the magistrate judge.

However, DeLuca's claim is supported by independent corroboration. Flora Colao testified at the evidentiary hearing that, during her meetings with petitioner, DeLuca repeatedly informed her that she wanted to testify, but was uncertain whether her lawyer would let her. According to Colao, "[s]he was very confident that the jury would understand if she had the opportunity to tell her story and felt very strongly that she had nothing to hide, because she kept saying I have nothing to hide, I'm willing to testify

... And she just kept saying I want to testify, but I don't know if they'll let me."

■ This corroborating testimony persuades the Court that DeLuca was, in fact, unaware that she had the ultimate right to decide whether or not to testify. Since the preponderance of evidence suggests that the petitioner was unaware that it was ultimately her decision whether or not to testify, and counsel admittedly did not correct that misperception, this Court finds that petitioner has been denied effective assistance of counsel.

Nor can there be any doubt that DeLuca suffered prejudice as a result of her counsel's failure to inform her that she had the ultimate right to decide whether or not to testify. Given her repeatedly expressed desire to tell her side of the story, it is highly likely that the petitioner would have exercised her right had she known that her decision overrode her lawyer's. Numerous witnesses, including GaNun, one of her attorneys, testified that DeLuca both wanted and expected to testify at her trial.

Likewise, it is at least reasonably probable that had she testified, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. "The testimony of a criminal defendant at his own trial is unique and inherently significant. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Nichols v. Butler*, 953 F.2d 1550, 1553 (11th Cir.1992) (quoting *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961)).

In many criminal cases, "the most important witness for the defense ... is the defendant himself" *Rock v. Arkansas*, 483 U.S. at 52, 107 S.Ct. at 2709. Nowhere would that truism have been more applicable than in the instant case. Had DeLuca taken the stand, her testimony would have been the cornerstone of a defense that, if successfully presented, could have: 1) explained much of the

persuasive circumstantial evidence against her; 2) cast doubt on the veracity of the prosecution's two main witnesses; 3) provided some explanation for the shooting; 4) called Bissett's motivations on the night of the shooting into question; 5) educated the jury about Rape Trauma syndrome; and 6) painted a picture of herself that contradicted the prosecutor's portrayal of her as a black widow spider, a sex-starved woman who mates and then kills.

Moreover, had she testified, Patten, who testified that he was unwilling to present a "partial defense" because he feared that the jury would wonder what they had to hide, would have felt free to support her version of events both with corroborating testimony and medical and physical evidence. Under these circumstances, this Court holds that DeLuca received constitutionally ineffective assistance of counsel.

### III. Preclusion of Expert Witness on Rape Trauma Syndrome

Finally, petitioner contends that the trial court's refusal to allow Flora Colao, the rape trauma syndrome expert, to testify violated her Sixth and Fourteenth Amendment right to present a defense. While this Court believes that Colao's expert testimony could have been admitted to refute the State's contention that DeLuca's rape claim was a false exculpatory statement evidencing knowledge of guilt, we find that the decision to exclude the testimony was well within Justice Tonetti's discretion.

After the prosecution rested, Patten requested permission to present the testimony of a defense expert regarding rape trauma syndrome. Arguing that "the law has for generations had a very male view on the concept of rape," Patten sought to introduce Colao's testimony to rebut the commonly held notion that a rape victim will make an immediate outcry. Patten contended that this notion results in a "prejudic[ial] belie[f]," reflected during the trial in the testimony of Detective Taylor,[27] that a woman who does

---

27. Detective Taylor testified at trial that he believed the sexual activity that took place in the van was consensual because

[b]ased on my investigation and my interview of witnesses at the scene and what they observed, there was no one screaming rape

not immediately call for help has not been raped.

Although sympathetic to Patten's argument, Justice Tonetti questioned "the relevancy of rape to this case."[28] In response, Patten replied that rape was relevant because of the prosecution's position "from the very beginning of this case that ... 'All you individuals know when you are being told a story.'" Referring to the testimony of Sgt. Eberhardt, he argued that part of the State's circumstantial evidence involved the testimony and argument that DeLuca created a false rape story to cover her guilt.[29]

Although Justice Tonetti reserved decision on the matter until after a short adjournment for lunch, he did express skepticism about Patten's grounds for admitting the testimony of Colao. Conceding that the proposed testimony "could be offered on the theory that it might have affected the mind or the state of mind of Peter DeLuca," the judge was still unwilling to admit it because there had been no evidence of Peter DeLuca's involvement in the shooting.

> If Peter DeLuca were to testify, that might be a factor. If [DeLuca herself] had testified she had been raped that might be a factor, but to allow an expert to testify about reactions of a rape victim on the theory that maybe that had some effect on someone seems to me to give rise to sheer speculation.

After the lunch recess, proceedings resumed and counsel and the court conferred at the bench in an off-the-record discussion. Both sides then rested in the presence of the jury. The record reflects no further discussion of the proposed expert testimony, no request for a ruling by defense counsel, and no decision by Justice Tonetti.

■ Respondents contend that petitioner abandoned her request to present the proposed expert testimony because she did not request a ruling from Justice Tonetti at trial. Therefore, they argue, she is procedurally barred from raising this claim in her habeas petition. The magistrate judge rejected this argument, finding that Justice Tonetti had put an end to this issue in his ruling at the § 440 hearing. Although admitting that his decision may have been off the record, Justice Tonetti stated that "my recollection is that ... the court made a ruling denying counsel's application to call that witness and that it was preserved for the record." This Court accepts Magistrate Judge Roberts recommendation that the respondents' assertion of a procedural default be rejected.

Turning to the merits of petitioner's claim, the magistrate found that Justice Tonetti did not abuse his discretion in excluding the proposed testimony because it was both collateral and of questionable probative value. Furthermore, she found that even assuming, *arguendo*, that he erred in precluding Colao's testimony, such error was not of constitutional dimension. Alternatively, if it was a constitutional error, it was harmless. The Court agrees with all of these findings and accepts them as its own.

■ It is well-established that a trial judge has broad discretion in determining the relevancy and admissibility of evidence.

---

> from the van. The van was seen in a rocking motion. There didn't seem to be any type of a fight going on at the time that this allegedly occurred.
>
> It is interesting that Detective Taylor found the absence of a cry of rape to be significant, but considered the absence of the sound of gunshots to be easily explained by the relatively high level of noise in the area.

28. Judge Tonetti explained to Patten:

> The theory of the prosecution in this case is based on circumstantial evidence.... That this defendant had access to the deceased, was last seen with the deceased, left the vicinity of the deceased prior to his demise, and that her gun killed him. That's the theory of the prosecution. It has nothing to do with whether she

> was raped or had consensual sex.... My question to you is what if she was raped?

29. Patten also contended that rape was relevant because, "if you have a circumstantial evidence case, it's just as likely that there would be a husband who finds out the wife has been raped, and in his own rage goes down and shoots the guy. We are allowed to argue that theory." However, that theory, part of Patten's "whodunit" defense, does not depend on proof that DeLuca was actually raped. All that need be shown is that Mr. DeLuca believed she was raped—something he could do even if it were not true. Thus, contrary to Patten's argument, Colao's testimony was irrelevant to this theory.

*Levy v. Abate,* 93 Civ. 0258 (JSM), 1993 WL 267421 (S.D.N.Y. July 9, 1993); *People v. Cronin,* 60 N.Y.2d 430, 470 N.Y.S.2d 110, 111, 458 N.E.2d 351, 352 (1983) ("The admissibility and bounds of expert testimony are addressed primarily to the sound discretion of the trial court.").

■ Moreover, even if erroneous, evidentiary rulings by state courts "do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983). A defendant is entitled to habeas relief only when she can show that the error was so prejudicial as to amount to a denial of due process or that it was tantamount to the denial of a *"fundamentally fair* trial." *Id.* at 891 (emphasis in original; citations omitted). "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." *Rosario v. Kuhlman,* 839 F.2d 918, 925 (2d Cir.1988) (citing *Taylor v. Curry).* Erroneously excluded evidence is material, and constitutional error has been committed " 'if the omitted evidence creates a reasonable doubt that did not otherwise exist'." *Rosario,* 839 F.2d at 925 (quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976)).

■ While the testimony of Flora Colao was arguably relevant to the State's characterization of DeLuca's rape report as a false exculpatory statement that circumstantially demonstrated her consciousness of guilt, Justice Tonetti did not abuse his discretion in disallowing it. In the absence of a justification defense, Justice Tonetti was correct in arguing that the truth or falsity of DeLuca's rape claim was a collateral issue and of limited probative value.

> Where the proposed evidence is not critical factual testimony but expert testimony offered for the very limited purpose of supporting credibility, the trial court's failure to admit such testimony did not deny defendant her Sixth Amendment right to present witnesses in her defense.

*Fennell v. Goolsby,* 630 F.Supp. 451 (E.D.Pa. 1985).

Moreover, petitioner's proposed expert had no personal knowledge of the facts surrounding the shooting. "The testimony excluded was not that of a 'key fact witness' who actually observed the crime. Rather petitioner's expert would have testified as to petitioner's state of mind.... The Constitution does not require that such testimony be admitted." *Tourlakis v. Morris,* 738 F.Supp. 1128 (S.D.Ohio 1990).

To the extent Patten wished to introduce this testimony as a foundation for a justification defense, as he appeared to be claiming at the evidentiary hearing before the magistrate judge, then the fault lies with Patten. Justice Tonetti clearly indicated that he would have been receptive to Colao's testimony, if it were presented in conjunction with DeLuca's testimony. At no time did Patten suggest to Justice Tonetti that the expert's testimony would be part of a justification defense, or that petitioner would be testifying that she had committed what she believed to be justifiable homicide.

In order to violate the Sixth Amendment, the omitted evidence must "create[ ] a reasonable doubt that did not otherwise exist." *Rosario,* 839 F.2d at 925. Even if, based upon Colao's testimony, the jury might be more inclined to believe that DeLuca had been raped, the fact that it was her gun that killed Bissett and that she had access to him prior to his death remained unchallenged. Accordingly, in the absence of a justification defense, the fact that petitioner may have been raped created no reasonable doubt that did not otherwise exist. For the same reasons, any constitutional error in excluding the expert's testimony did not have a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson,* —— U.S. ——, ——, ——, 113 S.Ct. 1710, 1714, 1722, 123 L.Ed.2d 353 (1993).

### *Conclusion*

This Court finds that Patten's actions in failing to 1) inform and advise DeLuca about the option of an EED defense and 2) inform his client that she had the ultimate right to choose whether or not to testify, were suffi-

cient to undermine confidence in the outcome of DeLuca's trial.

For the reasons set forth above, DeLuca's petition for a writ of habeas corpus is granted and the conviction set aside. DeLuca is to be released from prison unless she is afforded a new trial within 180 days of this date.

It is so ordered.